UNITED STATES of America, Plaintiff,

v.

BESTLINE PRODUCTS CORPORATION et al., Defendants.

No. C–73–0944–CBR.

United States District Court, N. D. California.

April 2, 1976.

James L. Browning, Jr., U. S. Atty., William B. Spohn, San Francisco, Cal., Robert V. Allen, Charles R. McConachie, Dept. of Justice, Washington, D.C., for plaintiff; Henry G. Pons, F.T.C., Washington, D.C., Ralph E. Stone, F.T.C., San Francisco, of counsel.

Joseph W. Cotchett, Cotchett, Hutchinson & Dyer, San Mateo, Cal., for defendant Bailey.

Robert W. Humphreys, Humphreys, Berger & Pitto, San Jose, Cal., for defendants Bestline.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

The United States of America brought this action pursuant to the Federal Trade

Commission Act, 15 U.S.C. §§ 45 and 49, to recover civil penalties for alleged violations of a Federal Trade Commission Consent Order to Cease and Desist ("Consent Order"). On September 30, 1974, the Court approved a Final Consent Judgment and Order respecting the corporate defendants. The remaining defendant is William E. Bailey. Both parties have moved for partial summary judgment; these motions were argued extensively at hearings held on September 4, 1975, and December 11, 1975.

## I. *Factual Background*

On July 22, 1970, the Federal Trade Commission ("Commission") notified Bestline Products Corporation and Bestline Products, Inc. ("Bestline"), William E. Bailey, and Robert W. DePew of its intention to issue an administrative complaint against the corporations and against Bailey and DePew, individually and as officers of the corporations.[1] The complaint charged, *inter alia,* that the multi-level marketing program Bestline utilized in connection with the sale of its household and industrial cleaning products permitted participants to receive compensation for both the sale of Bestline products to the consuming public on a retail basis and in addition—and this was the basis of the Commission's concern—for recruiting other persons to enter the Bestline distribution network. The complaint further alleged that persons were induced to participate in Bestline's marketing program by statements and representations that large financial awards would be derived through product sales and recruitment whereas, in truth and in fact, the realization of the represented financial gains contemplated "a virtually endless recruiting of participants into the sales program" and was "necessarily predicated upon, the exploitation of others who [had] virtually no chance of receiving a return on their investment". For these and other reasons, the complaint concluded and charged that "the use by respondents of the

aforesaid program in connection with the sale of their merchandise was and is an unfair act and practice, and was and is false, misleading and deceptive." *In the Matter of Bestline Products Corporation,* F.T.C. Docket No. C–1986, Complaint at 5–6.

The marketing program described and challenged in the complaint encompassed four levels of distribution personnel: the Retail Distributor, the Sub-Wholesaler, the Direct Distributor and the General Distributor. Participants at each level were entitled to purchase Bestline products at variable discounts. Thus, the Retail Distributor purchased products from a Sub-Wholesaler or Direct Distributor at a 30 to 40 per cent discount; the Sub-Wholesaler received a 30 to 51 per cent discount; the Direct Distributor received a 52 per cent discount; and the General Distributor received a 60 per cent discount. The compensation paid participants for recruiting other persons to enter the Bestline distribution network also varied. For example, a Sub-Wholesaler received a bonus for recruiting a Direct Distributor, and a commission for recruiting another Sub-Wholesaler. He was entitled to overrides on purchases by Retail Distributors below him, as well as commissions and continuing overrides on purchases by persons he recruited. The General Distributor received a commission and continuing overrides on all purchases by a Direct Distributor recruited by him. If a Direct Distributor recruited by the General Distributor ascended to the position of General Distributor, the sponsoring General was entitled to a release fee, commission, and continuing override on all future purchases by the recruited General.

A participant ascended the Bestline distribution chain by meeting certain product-purchase requirements. A Sub-Wholesaler was required to purchase products with a $400 "refund volume" value; the comparable purchase requirement for a Direct Distributor was $6,000. Only a Direct Distrib-

---

1. Mr. DePew is no longer associated with the Bestline corporations and is not a party to the instant action.

utor could qualify as a General Distributor. In addition, a Direct seeking to become a General was required to recruit another Direct, and pay $2,750 to Bestline.

Following a period of negotiations, the Commission and the proposed respondents agreed to settle the case by entry of a proposed consent order. Although respondents did not admit that the acts and practices condemned in the complaint violated 15 U.S.C. § 45, they did agree that "[t]he complaint may be used in construing the terms of the order." *In the Matter of Bestline Products Corporation,* F.T.C. Docket No. C–1986, Agreement Containing Consent Order to Cease and Desist, at 2. They further agreed that

"Proposed respondents William E. Bailey and Robert W. DePew are officers and stockholders of the corporate respondents. They formulate, direct and control the acts and practices of the corporate respondents." *Id.* at 1.

Bailey signed the agreement containing the Consent Order in three capacities: (1) President of Bestline Products Corporation (2) President of Bestline Products, Inc., and (3) "individually and as an officer of said corporations". *Id.* at 6–7. On July 22, 1971, the Commission issued the Consent Order, which became final on November 3, 1971.[2]

2. Pursuant to the Consent Order, respondents agreed to cease and desist from:

"1. Operating or, directly or indirectly, participating in the operation of any multi-level marketing program wherein the financial gains to the participants are dependent upon the continued, successive recruitment of other participants.

"2. Offering to pay, paying or authorizing the payment of any finder's fee, bonus, override, commission, cross-commission, discount, rebate, dividend or other consideration to any participants in respondent's multi-level marketing program for the solicitation or recruitment of other participants therein.

"3. Offering to pay, paying or authorizing payment of any bonus, override, commission, cross-commission, discount, rebate, dividend or other consideration to any person, firm or corporation in connection with the sale of any product or service under respondent's multi-level marketing program unless such person, firm or corporation performs a bona fide and essential supervisory, distributive, selling or soliciting function in the sale and delivery of such products to the ultimate consumer.

"4. Requiring prospective participants or participants in respondents' said program to purchase the product or pay any other consideration, other than payment for the actual cost of necessary sales materials, in order to participate in any manner therein; provided, however, that respondents may require or may suggest the purchase of specific and reasonable inventories only, by any distributor, on the express condition that respondents at the same time agree to repurchase any unused and undamaged portion of an initial inventory from any purchaser thereof at full cost less reasonable shipping costs, if any, within 90 days from the delivery of the product at the option of the purchaser; provided further, however, that if inventory costs reach $500 or more, within said 90 day period, then said obligation to repurchase shall cease immediately upon participant's tendering a subsequent order to purchase the product.

"5. Using any multi-level marketing program, either directly or indirectly:

"(a) Wherein any finder's fee, bonus, override, commission, cross-commission, discount, rebate, dividend or other compensation or profit inuring to participants therein is dependent on the element of chance dominating over the skill or judgment of the participants; or

"(b) Wherein no amount of judgment or skill exercised by the participant has any appreciable effect upon any finder's fee, bonus, override, commission, cross-commission, discount, rebate, dividend or other compensation or profits which the participant may receive; or

"(c) Wherein the participant is without that degree of control over the operation of such plan as to enable him substantially to affect the amount of any finder's fee, bonus, override, commission, cross-commission, discount, rebate, dividend or other compensation or profit which he may receive or be entitled to receive.

"6. Using any multi-level marketing program which fails to:

"(a) Inform orally all participants in respondents' multi-level marketing programs and to provide in writing in all contracts of participation that the contract may be cancelled for any reason by notification to respondents in writing within three working days from the date of execution of such contract.

"(b) Refund immediately all monies to (1) Participants who have requested contract cancellation in writing within three working days from the execution thereof, and (2) participants showing that respondents' contract solicitations or performance were attended

On September 8, 1971, respondents commenced discussions with the Compliance Division of the Commission. By letter dated October 1, 1971, Mr. Henry G. Pons, an attorney with the Commission's Compliance Division, informed counsel for Bestline that the materials that had thus far been submitted to the Commission failed to establish that respondents were in compliance with the Consent Order. Specifically, Mr. Pons indicated that paragraphs 1, 2, 3, 4, 5, 6(a), 7, 10 and 12(a) of the Consent Order had not been complied with. Counsel for Bestline, Mr. Richard J. Grillo, replied to Mr. Pons' letter by letter dated October 22, 1971. It is clear from these two letters that significant differences existed between the Commission and the respondents to the Consent Order in the interpretation of the Order, particularly with respect to paragraphs 1 and 3. Negotiations continued and on November 10, 1971 a final compliance report was filed with the Commission.

Under the first revised marketing plan described in the November 10, 1971 compliance report, the number of levels in Bestline's marketing program was reduced from four to three: the Local Distributor, the Direct Distributor, and the General Distributor. As in the original marketing program, all distributors were entitled to retail Bestline products directly to the public, and to sponsor other persons they recruited into the marketing program. Distributors received variable discounts for product purchases depending upon purchase volume: 30 to 52 per cent for a Local Distributor, 52 per cent for a Direct, and 60 per cent for a General.

According to the revised marketing program, a Local Distributor who "sponsored" and "assisted" other Local Distributors in making sales received a volume credit for the recruit's product purchases. In this manner, a Local could increase his product discount up to the 52 per cent level. A Local Distributor could ascend to Direct in one of two ways. He could sell $4,800 retail value of Bestline products in one calendar month, with the product purchases of persons he recruited as Local Distributors counting towards his purchase volume requirements. Alternatively, a Local Distributor could ascend by pre-purchasing approximately $5,500 (retail value) of inventory and sales aids from Bestline at a cost of $2,995.[3]

by or involved violation of any of the provisions of this order.

"7. Representing, directly or by implication, that participants in respondents' multi-level marketing programs will earn or receive any stated or gross or net amount; or representing, in any manner, the past earnings of participants unless in fact the past earnings represented are those of a substantial number of participants in the community or geographical area in which such representations are made and accurately reflect the average earnings of these participants under circumstances similar to those of the participant or prospective participant to whom the representation is made.

"8. Representing, directly or by implication, that it is not difficult for participants to recruit or retain persons to invest in respondents' multi-level marketing programs as distributors or as sales personnel to work home routes or sell respondents' products door-to-door or any other manner.

"9. Representing, directly or by implication, that it is not difficult for participants to ascend to a higher level of distribution within the marketing chain.

"10. Representing, directly or by implication, that all participants in the respondents' multi-level marketing program or any other sales program will succeed.

"11. Representing, directly or by implication, that the supply of available entrants or investors in the respondents' marketing program is inexhaustible; or misrepresenting, in any manner, the availability of such entrants or investors.

"12. (a) Failing to disclose, orally and in writing, the terms of this order to cease and desist to all present and future distributors, salesmen or other persons engaged in the sale of respondents' products, services, or merchandising programs, and securing from each such distributor, salesmen [sic] or other person a signed statement evidencing receipt of said disclosure.

"(b) Failing to make available on request a copy of this cease and desist order to any participant or prospective participant."

3. On the Direct Distributor Application furnished by Bestline, the $2,995 payment was broken down as $2,026 for initial inventory of product and sales aids, $528 for the General Distributor's discount, and $441 for administrative and processing costs.

A Direct Distributor was under contract to Bestline, and was charged with the responsibility of maintaining adequate inventory supplies for and training Local Distributors within his organization. A Direct derived profit from his own retail consumer sales, from sales to Local Distributors he recruited, and from sales to recruits sponsored by his Local Distributors. A Direct wishing to ascend to the General Distributorship level was required to recruit another Direct who, in turn, was required to purchase Bestline products of approximately $5,000 retail value. In addition, the ascending Direct Distributor was responsible for the purchase of another $5,000 of Bestline products in one calendar month, and was required to pay $600 (later increased to $700) into Bestline's General Training Fund, which entitled him to attend a three-day training program at Bestline's General Distributor School. Because the ascension of a Direct Distributor to a General Distributorship required total product purchases of $10,000, the commission of the sponsoring General Distributor, computed at the rate of 8 per cent, was $800. Thus the ascension of a Direct Distributor to General Distributor always netted the sponsoring General Distributor $800.

A General Distributor was also under contract to Bestline, and was responsible for training, supervising and motivating distributors enrolled under him. The General received an 8 per cent commission on sales of Direct Distributors below him, and was also entitled to a variable Special Incentive Bonus on product sales generated in his distribution chain. This bonus ranged from an estimated $1,200 for a sales volume of $36,000 to $30,000 for a volume of $200,000.[4] In addition, until February, 1972, a General Distributor received a continuing 3 per cent commission on all sales of a distributor he had sponsored who ascended to General Distributor.

In February, 1972, Bestline modified its marketing plan by adding the position of Candidate Direct Distributor. The Candidate was required to purchase $800 of products from a sponsoring General Distributor (for $500); after a minimum of seven days, and upon representation to Bestline that, *inter alia,* he had commenced a training program, had attended training seminars, and would train and assist new distributors he sponsored, the Candidate could ascend to Direct Distributor by purchasing $5,000 of products and sales aid from Bestline at a cost of $2,995. On these transactions the sponsoring General Distributor received approximately $540 in commission.

By letter dated March 17, 1972, the Commission notified Bestline that its compliance report had been rejected. The Commission's letter expressly stated that Bestline's compliance report had been reviewed only insofar as it related to paragraphs 1 and 3 of the Consent Order. Further correspondence from Mr. Pons on May 17, 1972, concerned the alleged noncompliance with paragraphs 4, 6, 7, 10 and 12(a). Negotiations continued, and on June 24, 1972, a Supplemental Compliance Report was filed with the Commission.

The marketing program was again revised on February 28, 1973. The range of the Local Distributor's discount was lowered from 30–52 per cent to 25–35 per cent, thereby increasing the Direct Distributor's maximum profit on sales from 22 to 27 per cent. The Candidate Direct Distributor program was also modified. The Candidate applicant was required to purchase at least $100 of Bestline products, submit retail sales slips totaling $100, and then purchase $5,600 of products and sales aids at a cost of $3,400. A Candidate Direct Distributor was then entitled to purchase Bestline products at a 45 per cent discount, which increased to 52 per cent after 90 days. The recruitment and ascension of a Candidate Direct Distributor netted the sponsoring General Distributor approximately $500 in commission.

For convenience, the Court will refer to the marketing program in effect until Feb-

---

4. The actual bonus payable was based upon 20 per cent of Bestline's total profit before taxes, and therefore depended upon Bestline's earned annual profits and the total number of General Distributorships in any one year.

ruary, 1972, as the first revised marketing program; the program in effect from February, 1972 to February, 1973, will be referred to as the second revised marketing program; and that utilized after February, 1973, as the third revised marketing program.

On March 8, 1973, in a letter sent to the attention of defendant and addressed to Bestline Products Corporation, the Commission informed Bestline that it had rejected Bestline's compliance report because the post-Consent Order marketing program violated paragraphs 1, 3, 4, 5, 6, 7, 8, 10, 11 and 12 of the Consent Order.

## II. *Defendant's Liability*

Preliminarily, the Court must consider defendant's contention that he cannot be held personally liable for alleged violations of the terms of the Consent Order, despite the fact that he signed that Order individually and as an officer of Bestline. Defendant has advanced a multi-pronged argument in support of this contention. He argues first that at no time subsequent to January, 1971, when he resigned as President of the Bestline enterprises, did he "exercise control over the decision making functions of other Bestline officers * * [or exercise] the kind of autocratic control necessary to impose individual liability on him for actions carried out by Bestline * * *." Defendant Bailey's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 78–79. Defendant's legal theory is clear: The Government must prove that he exercised, in his words, "monolithic", "autocratic" control

over Bestline in order for him to be held liable for alleged violations of the Consent Order.

■ Defendant cites no authority in support of that legal theory, and understandably so, for the Court finds it contrary to the weight of judicial authority and to common sense and experience. It is well established that a command to a corporation is binding on those responsible for the conduct of the corporation's affairs. As stated by the Supreme Court:

"A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." *Wilson v. United States*, 221 U.S. 361, 376, 31 S.Ct. 538, 543, 55 L.Ed. 771, 777 (1911).

The underlying purpose of the rule is obvious: "[I]t would seem in cases of this sort to be a futile gesture to issue an order directed to the lifeless entity of a corporation while exempting from its operation the living individuals who were responsible for the illegal practices." *Pati-Port, Inc. v. F. T. C.*, 313 F.2d 103, 105 (4 Cir. 1963). Indeed, so clear is the principle enunciated in *Wilson* that, in the absence of special circumstances, it is error to include in an order or decree directed against a corporation the corporation's officers in their individual capacities.[5] As the Commission itself has em-

---

**5.** Thus, for example, in *Hartford-Empire Co. v. United States*, 323 U.S. 386, 434, 65 S.Ct. 373, 396, 89 L.Ed. 322, 372 (1945), although the District Court found numerous violations of the Sherman Act, the Supreme Court held that it was error to direct the prohibitions of the decree against the executives personally. The Court stated:

"[I]n practically every instance where a corporate defendant is restrained from described action or conduct, these individuals, as individuals, are likewise restrained. Any injunction addressed to a corporate defendant may as various sections of the decree do, include

its officers and agents. If the individual defendants are officers or agents they will be comprehended as such by the terms of the injunction. If any of them cease to be such, no reason is apparent why he may not proceed, like other individuals, to prosecute whatever lawful business he chooses free of the restraint of an injunction. On the other hand, if new officers and directors take the places of these defendants, such new agents will automatically come under the terms of the injunction. There is no apparent necessity for including them individually in each paragraph of the decree which is applicable to the corporate defendants * * *."

phasized, "If acts are done as an officer they are done for the corporate respondent, and the order against the corporation will run against the officer as an officer." *The Lovable Co.*, CCH Trade Reg.Rep. ¶ 17282 (F.T.C. Docket No. 8620, June 29, 1965).

Nor can one be heard to argue, as defendant does here, that because one lacked absolute control over a corporation, one cannot be held to account for the corporation's conduct. Defendant places great emphasis upon what he characterizes as the diffuse, rather informal character of Bestline's decision-making process, arguing that no person should be held individually liable for decisions reached collectively through informal concensus. Were defendant's position to prevail, virtually all corporate officers could escape liability—of all kinds—for the acts of their corporation simply by arguing that each individually lacked authority to direct the corporation's affairs. The Supreme Court has explicitly rejected such a contention:

> "When one accepts an office of joint responsibility, whether on a board of directors of a corporation, the governing board of a municipality, or any other position in which compliance with lawful orders requires joint action by a responsible body of which he is a member, he necessarily assumes an individual respon-

sibility to act, within the limits of his power to do so, to bring about compliance with the order. It may be that the efforts of one member of the board will avail nothing. If he does all he can, he will not be punished because of the recalcitrance of others. [Citation omitted.] But to hold that, because compliance with an order directed to the directors of a corporation or other organization requires common action by several persons, no one of them is individually responsible for the failure of the organization to comply, is effectually to remove such organizations beyond the reach of legislative and judicial commands." *United States v. Fleischman*, 339 U.S. 349, 356–357, 70 S.Ct. 739, 743, 94 L.Ed. 906, 911 (1950).

■ Thus it is clear that if defendant was, in the words of the Supreme Court, "officially responsible" for the conduct of Bestline's affairs, and if he prevented Bestline from complying with the Commission's Order or "fail[ed] to take appropriate action within [his] power for the performance of the corporate duty," *Wilson v. United States, supra*, 221 U.S. at 376, 31 S.Ct. at 543, 55 L.Ed. at 777, then he is liable for Bestline's alleged noncompliance with the Commission's Order.

It is undisputed that from 1966 to 1970 defendant was President of the Bestline

To be sure, it is not uncommon for orders of the Commission to name corporate officers in their individual capacities, particularly where a relatively small, closely held corporation is charged with unfair or deceptive conduct. The Supreme Court upheld the propriety of this practice in *Federal Trade Commission v. Standard Education Society*, 302 U.S. 112, 119–120, 58 S.Ct. 113, 116–117, 82 L.Ed. 141, 146–147 (1937), on the grounds that including corporate officers individually may be necessary if the Commission's orders are "to be fully effective in preventing the unfair competitive practices which the Commission had found to exist.". *Id.* at 120, 58 S.Ct. at 117, 82 L.Ed. at 146. Subsequent to that decision many courts have upheld the Commission's decision to name corporate officers individually when circumstances so mandate, as, for example, when the corporate official personally directed the corporate activities and formulated its policies, or directly participated in the unlawful activity, or was the sole or one of few stockholders, or otherwise

gave the Commission reason to believe that an order against the corporation alone could be easily evaded. *See, e. g., Benrus Watch Company v. F. T. C.*, 352 F.2d 313, 324–325 (8 Cir. 1965); *Rayex Corporation v. F. T. C.*, 317 F.2d 290, 295 (2 Cir. 1963); *Pati-Port, Inc. v. F. T. C., supra*, 313 F.2d at 105; *Surf Sales Company v. Federal Trade Commission*, 259 F.2d 744, 747 (7 Cir. 1958); *Tractor Training Service v. Federal Trade Commission*, 227 F.2d 420, 425 (9 Cir. 1955), *cert. denied*, 350 U.S. 1005, 76 S.Ct. 649, 100 L.Ed. 867 (1956); *Consumer Sales Corp. v. Federal Trade Commission*, 198 F.2d 404, 407–408 (2 Cir. 1952), *cert. denied*, 344 U.S. 912, 73 S.Ct. 335, 97 L.Ed. 703 (1953); *Steelco Stainless Steel v. Federal Trade Commission*, 187 F.2d 693, 697 (7 Cir. 1951); *Gelb v. Federal Trade Commission*, 144 F.2d 580, 581 (2 Cir. 1944); *Sebrone Co. v. Federal Trade Commission*, 135 F.2d 676, 678 (7 Cir. 1943). *See generally*, Whiting, "Antitrust and the Corporate Executive," 47 Va.L.Rev. 929, 967–972 (1961).

corporations and Chairman of their boards of directors, and that during that period he did "formulate, direct and control the acts and practices" of the corporations. Agreement Containing Consent Order to Cease and Desist, *supra,* at 1. It is also undisputed that in January, 1971, Mr. David L. Eastis was promoted from Special Assistant to the President to President of Bestline. Thereafter, defendant continued in Bestline's employ as "Founder" and Chairman of the Board, for which he received $1,432,-367 in wages and salaries during the period January, 1971 through July 31, 1973.[6] Defendant's responsibilities during that period were described by him at length in a deposition taken on December 17 and 18, 1973, and, more briefly, in an affidavit executed on November 26, 1975. Defendant characterizes his role at Bestline as that of a relatively uninvolved "elder statesman", serving as "an image of goodwill for the corporation". But his own testimony belies that characterization. His testimony shows unmistakably that subsequent to January, 1971, although he ceased to participate in the day-to-day management of the corporation, he remained active in the formulation, direction and review of major corporate policies.[7] His testimony also shows that he was actively involved in discussing and approving the specific changes in Bestline' marketing programs undertaken in response to the Commission's Consent Order;[8] indeed, defendant has admitted that between November 3, 1971, and August 31, 1973, he "was aware of and approved each and every change, amendment, modification, or alteration of the Bestline Products, Inc., marketing program." Defendant's Answers to Plaintiff's Request for Admissions, No. 56.

■ In the opinion of the Court, defendant's own testimony and admissions, as set forth above, clearly show that from the

---

**6.** During the same period defendant also received $339,593 from Bestline for rents, royalties, interest and dividends, and an additional check in the sum of $100,000. On or about July 1, 1973, Bestline Products, Inc., also paid to the State of California the $250,000 penalty imposed on defendant individually by the court in *People of the State of California v. Bestline Products, Inc., et al.,* No. C-2842 (Sup.Ct.Cal., May 12, 1971). The data concerning the wages, salaries and other compensation Bestline paid defendant are detailed in Defendant's Answers to Plaintiff's Request for Admissions, Nos. 11-15.

**7.** Defendant testified that after he resigned as President, he "pulled completely away from the day-by-day operation of the company." Nevertheless, he stated that Eastis routinely presented him with problems confronting Bestline: "[T]here were certain kinds of broad policy decisions I was always presented with. Day to day, as to whether they should fire somebody in Chicago, or give somebody a raise, a secretary, that I didn't hear about. David [Eastis] had that authority, and he knew it." Deposition of William E. Bailey, December 17, 1973, at 25-27. Defendant further testified that as Founder and Chairman of the Board his counsel and advice were sought by Bestline's other executives; that he met frequently—at least once a week—with Eastis; and that he regularly attended meetings of Bestline's Executive Committee, "a very loose group of people who would normally be involved in any major policy

decision that was going to be made." *Id.* at 26 and 14.

**8.** On that point, defendant testified as follows: "[T]hose discussions [concerning revisions in Bestline's Information Manual, in which the company's marketing program is described] went on, and on, on an almost constant basis. And whether it was three people, or four people, or five people, we would meet at the Hill House—I remember some meetings. They started at 9:00 in the morning and ended up at 10:00 at night, because you have everyone trying to get it into a form which will comply and, by the same token, allow us to continue in business. * * *

"I can't tell you how many, but the thrust to cause the literature, the thrust to cause the marketing plan to change, the thrust to get language which would comply with the order, yet not be so technical that, in fact, you destroy the very thing you are trying to say, that was almost a constant one, and that went on—hell, that was almost daily." *Id.* at 117-118.

Defendant also stated that, "I did not personally become involved in compliance matters such as the rewriting of the Bestline Business Opportunity Booklet, the opportunity meeting scripts, the information manual and other literature. *After the work on those was completed I did review them for suggestions or additions.*" Affidavit of William E. Bailey, at 3-4 (emphasis added).

time defendant resigned as President of Bestline until he left the company's employ in August, 1973, he continued to function within the corporate hierarchy as a senior executive who participated in the formulation of major corporate policies, and who helped to revise and ultimately approved Bestline's post-Consent Order marketing programs. This is not a case where a formerly controlling corporate officer withdrew so substantially from on-going participation in the conduct of the corporation's affairs that the responsibility for compliance with the Commission's Order necessarily fell on the shoulders of others. In short, defendant's own testimony establishes that he was among those Bestline executives who were "officially responsible for the conduct of [the corporation's] affairs." *Wilson v. United States, supra,* 221 U.S. at 376, 31 S.Ct. at 543, 55 L.Ed. at 777. Defendant cannot escape the consequences of that responsibility simply by arguing that he chose to remain uninvolved in the day-to-day operations of the corporation and did not personally redesign Bestline's marketing programs.

Also significant, in the opinion of the Court, is the fact that defendant was one of only two corporate officers who signed the Consent Order in an individual capacity. The Court is, of course, aware that the primary reason the Commission names a corporate officer individually in an Order directed to the officer's company is to prevent him from attempting to evade the Order in his individual capacity, that is, outside the corporate structure.[9] However, it does not then follow, as defendant argues, that as long as the officer does not seek to operate outside the corporation he remains immune from liability under the Order. As an individual signatory to the Order, defendant was personally bound by its terms and would remain so until such time as either the Commission or the courts

saw fit to modify the obligations the Order placed upon him. The conduct expected of defendant *as an individual* was thus, at a minimum, coextensive with that demanded of him as a corporate officer responsible for Bestline's affairs.

The law is clear that defendant, as a corporate official responsible for the conduct of Bestline's affairs and as an individual signatory to the Consent Order, was under an affirmative obligation to act to insure compliance by Bestline with the Commission's Order, *In re Dolcin Corporation,* 101 U.S.App.D.C. 118, 247 F.2d 524, 534 (1956), *cert. denied,* 353 U.S. 988, 77 S.Ct. 1285, 1 L.Ed.2d 1143 (1957); *United States v. Greyhound Corporation,* 363 F.Supp. 525, 572 (N.D.Ill.1973), and can be held liable for failure to fulfill that obligation adequately. As the court explained in *In re Dolcin Corporation, supra,* 247 F.2d at 534, with reference to a decree of the court,

> " * * * [T]his court did not impose an obligation on Shimmerlik and Wantz that they could discharge by remaining inert. We imposed an affirmative obligation upon them, individually and as officers of Dolcin, to take all reasonable steps to effect compliance with this court's order. Those steps included, at least, that they become currently informed of the advertising conduct of Dolcin. That their 'articulations' to van der Linde might have been unavailing does not relieve them of the responsibility to make those articulations. And we are not prepared to predict that such efforts, had they been made, would have been 'meaningless.' Whatever the order of this court directed Shimmerlik and Wantz to do, it did not permit them to stand idly by while the Dolcin Corporation—their corporation—continued to flout our order.
> * * *
>
> * * * * * *

**9.** The Court notes, without comment, that an additional purpose for naming individuals in a Consent Order may well be "to establish and emphasize the personal liability of individuals who are instrumental in the formation of corporate policy for the compliance of the corporate entities which they direct." Affidavit of William J. Marschalk [the Commission staff attorney who represented the Commission in negotiations with defendant], at 2.

"Were we to take the opposite view, we would be putting a premium on ignorance and offering a sanctuary for those remiss in performing their duties as corporate officers. See *Fleischman*, supra, 339 U.S. at page 364, 70 S.Ct. at page 746 [94 L.Ed. 906]. Shimmerlik and Wantz should not be permitted to use their own inertia as a shield against the force of this court's decree."

See also *United States v. Greyhound Corporation, supra,* 363 F.Supp. at 572–573.

■ The Court is unpersuaded by either of defendant's affirmative defenses. He asserts that he cannot be held personally liable for alleged violations of the Consent Order because he signed the Order under a mistake of fact, "believing that his signature bound him to Bestline's activities only in his official capacity." He further argues that he signed the Order under a mistake of law, "in that he believed that his individual signature would not bind him to strict liability for any and all activities of the Bestline corporations which might be found violative of the order." Defendant Bailey's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 82.

Both of these purported defenses focus exclusively upon the circumstances surrounding defendant's decision to sign the Consent Order in his individual capacity. However, the Court has stated that, in its opinion, defendant can be held liable for alleged violations of the Consent Order solely by virtue of his position as a senior officer responsible for Bestline's affairs and irrespective of his status as an individual signatory to the Consent Order. Even were this not the law, the Court finds no merit in defendant's affirmative defenses. None of the affidavits before the Court in any way suggests that the Commission induced defendant to sign the Consent Order, either as a corporate officer or individually, under an express or implied promise of immunity from civil penalties. In essence, defendant asks this Court to relieve him of liability under the Consent Order because he misunderstood the nature and extent of that lia-

bility. This the Court will not do. As explained by the Court of Appeals for the Eighth Circuit with reference to a consent decree issued in an antitrust case,

"Simply because a party misconstrues its lawful obligations under such decrees, it is not afforded a legal defense if in law that interpretation turns out to be erroneous. Misunderstanding of the law is no more an excuse under the Clayton Act than anywhere else. In effect, the argument proffered here is similar to the defendant's contention, urged more emphatically in the district court under Count II, that it acted in good faith. We think, as did the district court, that if this has any relevancy at all it is a factor to be considered by the trial court only in measuring or mitigating the penalty." *United States v. Beatrice Foods Co.,* 493 F.2d 1259, 1269 (8 Cir. 1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

The Court holds that, based solely on the facts to which defendant has testified, the law charged defendant with the responsibility of insuring that Bestline's marketing program complied with the Commission's Order, and that defendant can be held liable for the failure of Bestline's marketing program so to comply.

III. *Compliance with the Consent Order*

The cross motions for partial summary judgment presently before the Court are directed only to the first of the 142 counts contained in the First Amended Complaint. Count One charged defendant with violations of paragraphs 1, 3, 4, 5, 6(a) and 12(a) of the Consent Order. Each of these alleged violations will be considered separately, except that the Court will follow the parties' lead in discussing paragraphs 1 and 3 together.

A. *Paragraphs 1 and 3*

As set forth in footnote 2 herein, paragraph 1 of the Consent Order directed the respondents to cease and desist from operating a multi-level marketing program

wherein the financial gains to the participants "are dependent upon the continued, successive recruitment of other participants." Paragraph 3, in turn, proscribed the payment of any consideration to any participant in Bestline's marketing program unless that participant "performs a bona fide and essential supervisory, distributive, selling or soliciting function in the sale and delivery of such products to the ultimate consumer."

As noted in Part I of this Memorandum, the parties negotiated at length concerning the precise language to be included in the Consent Order. The parties disagree sharply on whether those pre-Consent Order negotiations are admissible for the purpose of construing the Consent Order and determining whether defendant has complied therewith. The Government argues, with citation to *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256, 263 (1971), and *United States v. Beatrice Foods Co., supra,* 493 F.2d at 1264, that the commands of a consent order must be found "within its four corners", *Armour, supra,* 402 U.S. at 682, 91 S.Ct. at 1757, 29 L.Ed.2d at 263, and that when, as here, the language of the Consent Order is unambiguous, inquiry into extrinsic matters is clearly improper. Defendant, on the other hand, maintains that paragraph 1, and in particular the word "dependent", is ambiguous and requires reference to parol evidence. The Court is permitted to resort to such evidence, defendant argues, in light of the Supreme Court's recent decision in *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). In that case, the Court sanctioned reference to the parties' negotiated "Agreement Containing Consent Order to Divest and to Cease and Desist", to an appendix incorporated by reference in that agreement, and to the complaint, as "aids to the construction of the order and of the agreement of which it is part." *Id.* at 238, 95 S.Ct. at 935, 43 L.Ed.2d at 163. The Court explained:

"Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree.[11]

"[11] 'Assuming that a consent decree is to be interpreted as a contract, it would seem to follow that evidence of events surrounding its negotiation and tending to explain ambiguous terms would be admissible in evidence.' Handler, *supra,* n. 10, at 23 n. 148." *Id.* at 238, 95 S.Ct. at 935, 43 L.Ed.2d at 162.

Such reliance does not in any way depart from the 'four corners' rule of *Armour*.

\*　　\*　　\*　　\*　　\*　　\*

In the instant case a key issue—and one which the parties have exhaustively briefed and argued—is the construction to be accorded the phrase in paragraph 1, "dependent upon the continued, successive recruitment of other participants." The Government contends that "dependent" means "dependent *in any manner*" (emphasis in original), Plaintiff's Memorandum in Opposition to Defendant Bailey's Motion for Partial Summary Judgment, at 11, and includes "*both* 'partially dependent' and 'wholly dependent,'" Plaintiff's Reply Memorandum in Support of Its Motion for Partial Summary Judgment, at 3. Defendant, however, argues that when paragraphs 1 and 3 are construed together, "dependent" must be taken to mean "necessarily dependent", that is, "where the fortunes of the investor are necessarily dependent on a system of recruiting and there is no way for him to recoup his investment and make a profit." Defendant Bailey's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 22. Defendant, in effect, contends that paragraphs 1 and 3 prohibit participants from receiving "financial gains from recruiting others without performing a useful function in distributing or selling a product to the ultimate consumer." *Id.* at 22. But where they perform "a bona fide and essential supervisory, distributive, selling or soliciting function in the sale and delivery of such products to the ultimate

consumer," Consent Order, paragraph 3, then, defendant maintains, the marketing program complies with the Consent Order *even if* the participants also are compensated for performing a recruiting function. In its briefs and during oral argument, the Government construed defendant's position to be that "dependent" means "solely" or "exclusively" dependent. The Court feels that this is a fair reading of defendant's argument.

■ The Court has carefully considered the arguments advanced by the parties in support of their alternative constructions to paragraph 1 and concludes that even when that paragraph is read in light of the Consent Order as a whole and the complaint incorporated by reference therein, its language remains reasonably susceptible to any of the interpretations—dependent "in any manner," "partially" dependent, "wholly" dependent, "necessarily" dependent, or "exclusively" dependent—the parties have proposed. Simply put, the Court agrees with defendant that on its face paragraph 1 is ambiguous and that that ambiguity cannot be resolved without the aid of extrinsic evidence.

As originally drafted, paragraph 1 of the proposed Consent Order directed the respondents to cease and desist from

"1. Operating or, directly or indirectly, participating in the operation of any multi-level marketing program wherein the financial gains to the participants are dependent *in any manner* upon the continued, successive recruitment of other participants." (Emphasis added.)

By letter dated October 23, 1970, Bestline's counsel requested deletion of the words "in any manner" from that paragraph. Counsel's letter read in pertinent part:

"In paragraph 1 of the Order (page 3), the phrase 'in any manner' has been deleted. We have agreed that no financial gains shall be dependent upon recruiting nor, as in paragraph 2, shall any compensation be paid for recruiting. The phrase 'in any manner' is surplusage at best and affords the Commission no additional

powers. At worst, however, the phrase could be interpreted as emphasis designed to connote an absolute prohibition of recruiting, including the necessary, proper and *uncompensated* recruitment of replacement sales personnel. We merely ask the Commission to take notice of the fact that sales personnel in all industries are somewhat temporary and mobile. No company can long survive without recruitment. The proposed language was intended, and the proposed change herein is equally designed, to prohibit the alleged practice of compensating investor-salesmen personnel ('participants') for any recruiting function they may perform." (Emphasis in original.) Letter from Micah H. Naftalin of Elliott & Naftalin to Hon. Joseph W. Shea, Secretary, Federal Trade Commission, October 23, 1970, at 3.

Following receipt of that letter, the Commission acquiesced in the deletion of the words "in any manner".

The Court believes that Mr. Naftalin's letter establishes beyond doubt that the deletion of the phrase "in any manner" from paragraph 1 of the proposed Consent Order—a phrase that Mr. Naftalin himself termed "surplusage"—effectuated no substantive change in the scope of the Order and was designed solely to eliminate the possibility that Bestline's "necessary, proper and *uncompensated* recruitment of replacement sales personnel" might later be found to violate the terms of the Consent Order. The clear thrust of Mr. Naftalin's comments is that compensation would *not* be paid for recruitment. As he wrote, "The proposed language was intended, *and the proposed change herein is equally designed,* to prohibit the alleged practice of compensating investor-salesmen personnel ('participants') for *any* recruiting function they may perform." (Emphasis added.) In the opinion of the Court, Mr. Naftalin's letter shows that he was concerned, and legitimately so, that the Consent Order not prohibit Bestline from continuing its routine replacement of personnel, a necessary and vital activity for any company and particu-

larly for a company engaged in consumer sales. As Mr. Naftalin emphasized, no business organization can long survive if prevented from hiring replacement personnel, or from hiring personnel needed for legitimate expansion. Thus the continued financial rewards of all employees are, in a sense, indirectly and remotely "dependent" upon "recruitment" of new personnel. It was the right to undertake that type of innocent, uncompensated recruitment, and only that type, that Mr. Naftalin sought to preserve, and succeeded in preserving, for Bestline. But as Mr. Naftalin's letter makes explicit, with the exception of that kind of recruitment, *"no financial gains shall be dependent upon recruiting * * *."* (Emphasis added.)

In light of these negotiations, the Court finds defendant's proposed interpretation of paragraph 1 incredulous. Having secured the Commission's agreement to delete the phrase "in any manner" from the Consent Order on the express representation that it was "surplusage" and that retaining that phrase would afford the Commission "no additional powers", defendant now attempts to persuade the Court that for the Government "to read 'in any manner' back into the order, notwithstanding its express deletion * * *" is "incredible". Reply Memorandum of Points and Authorities in Support of Bailey's Motion for Summary Judgment, at 4, and Memorandum of Points and Authorities in Support of Bailey's Motion for Summary Judgment, at 21. On the contrary, the Government's construction of paragraph 1 is in all respects consistent with both the language of the Consent Order and the history of the parties' negotiations. In particular, when the language of paragraph 1 is interpreted as the Government suggests to prohibit the payment of compensation which is directly dependent in any manner upon recruitment, then that paragraph tracks smoothly and logically with the requirement set forth in paragraph 3 that compensation can be paid only for a bona fide and essential supervisory, distributive, selling or soliciting function.

■ Accordingly, the Court concludes that paragraphs 1 and 3 prohibit the operation of a marketing program wherein participants are directly compensated for any recruiting functions they may perform, irrespective of whether they are also compensated for performing a useful function in the distribution or sale of product to the ultimate consumer. The Consent Order, however, does not proscribe the payment of compensation for the performance of such a bona fide and essential distributive or selling function, nor does it proscribe the *un*compensated recruitment of marketing program personnel or the indirect, remote financial gain that may accrue as a result of routine hiring of personnel.

The Court has reviewed the evidentiary materials submitted by the parties, in particular the Bestline Business Opportunity Booklets, the Bestline Information Manuals, and the opportunity meeting scripts.[10] We now turn to several features of the post-Consent Order marketing programs described in those materials which may possibly violate paragraphs 1 and 3 of the Order:

1. As set forth in Part I of this Memorandum, in each of the post-Consent Order marketing programs the discount at which a Local Distributor bought from Bestline varied according to the total volume of product purchased each month. That volume was composed of his own direct sales to consumers plus the sales orders of all other Local Distributors he had "sponsored" and "assisted". Similarly, a Direct Distributor received commission on product orders of all Local Distributors whom he had sponsored and assisted, and a General Distribu-

---

10. Bestline's marketing programs are described in detail in those materials. Because the marketing program was revised on several occasions following the entry of the Consent Order, the parties have submitted three distinct sets of materials. The first sets forth the first revised marketing program as of November 10, 1971, the date on which Bestline submitted its Compliance Report to the Commission. The second, reflecting changes made in the marketing program in February, 1972, describes the second revised marketing program, and the third incorporates changes made in February, 1973.

tor, in turn, earned an 8 per cent commission on all product orders of those in his chain of distribution.

2. If a Local Distributor who had originally been sponsored by a General Distributor chose to ascend to a Direct Distributorship by pre-purchasing approximately $5,500 worth of inventory and sales aids, the sponsoring General received an 8 per cent commission, ranging from approximately $400 to $540, depending upon the marketing program in effect at the time.

3. A Direct Distributor could not ascend to a General Distributorship without first finding another individual to replace him as a Direct; that individual was required to generate $5,000 of product orders in one month, netting the sponsoring General $400 commission.

4. Under the first revised marketing program, a General Distributor continued to receive a continuing 3 per cent commission on the sales volume of any of his Direct Distributors who advanced to the position of General Distributor.

That participants at all levels of the marketing program gained financially from sponsoring and assisting other participants is undisputed; what remains in contention is whether that gain stemmed from the kind of "recruitment" proscribed by paragraph 1 of the Consent Order, as the Government maintains and defendant denies.

In support of his position, defendant points to the obligations placed upon all participants in the marketing program to train, supervise, motivate and assist those in their chain of distribution in the sale of product. For example, a Local Distributor who sponsored another Local Distributor acted as an intermediary between that Local and their Direct Distributor, collecting product order forms from the sponsored Local, forwarding them to the Direct, and channeling product from the Direct to the Local. The Direct Distributor, in turn, was required by contract "to maintain a sufficient inventory of the various products so as to be able to meet the requirements of his [local] distributors and customers." Bestline Direct Distributor Agreement, utilized prior to February, 1972, ¶ 26; later contracts obligated the Direct "to provide such management, inventory, supplies, training and assistance as is reasonably required by any and all local distributors with whom he has contracted." Bestline Direct Distributor Agreement, utilized February, 1972 to February, 1973, ¶ 6. A General Distributor, although not directly involved in the distribution of product, was similarly obligated. Bestline General Distributor Agreement, utilized February, 1972 to February, 1973, ¶ 8. He was also bound "to conduct sales courses designed to assist his distributors, both Direct and local, in the best use and application of Bestline products and the methods of salesmanship most appropriate to accomplish the sale of these products to the ultimate consumer." *Id.* ¶ 7. In short, defendant argues that these obligations to supervise, train and maintain inventory for those in one's chain of distribution clearly show that any financial gain received was for the performance of a bona fide and essential function in the distribution and sale of product to the ultimate consumer, and not for recruitment.

The Government, on the other hand, argues that these purported obligations existed on paper only and were but a sham to disguise the fact that participants continued to be rewarded for recruiting others into Bestline's marketing structure. Indeed, it is the Government's position that recruitment remained the main thrust of Bestline's marketing program and the principal objective and source of remuneration for participants therein. The Government urges the Court to reject defendant's argument that all financial gains were earned for the performance of bona fide and essential marketing functions. In the Government's view, the purported existence of those functions cannot correct the marketing programs' continuing failure to eliminate the accrual of financial gain to participants which was dependent upon recruitment. Moreover, the Government maintains that those supervisory and training

functions would not even satisfy the requirement of paragraph 3 since they were not essential to the sale and delivery of product to the *ultimate* consumer.

■ The Court agrees with the Government. As the Court has already concluded, paragraph 1 of the Consent Order prohibited participants from receiving financial gains which were directly dependent in any manner upon recruitment. Here the undisputed facts of record show that a participant, whether a Local, Direct or General Distributor, benefitted financially from persuading others to join the Bestline marketing structure and enter his chain of distribution. Particularly egregious, in light of the requirements of the Consent Order, was (1) the $400 to $500 commission paid to a General when a Local he had originally sponsored chose to ascend to Direct by prepurchasing approximately $5,500 worth of inventory and sales aids and (2) the additional $400 commission a General received because a Direct wishing to ascend to General was required to locate another individual responsible for the purchase of $5,000 of product in one month. Also directly violative of the terms of paragraph 1 was the continuing 3 per cent commission payable under the first revised marketing program to a General when any participant previously within his chain of distribution ascended to General Distributor.

■ Moreover, the Court is not persuaded by defendant's argument that all participants regularly and actively supervised, trained, motivated and assisted those that they "sponsored." The Court repeats that, even were that in fact the case, it would not serve to excuse noncompliance with paragraph 1 of the Consent Order. However, the Court doubts strongly whether participants in Bestline's marketing program viewed their supervisory and training responsibilities as seriously as defendant maintains. To be sure, this question is one of fact, incapable of final resolution within the context of cross motions for partial summary judgment. There are several factors, though, contributing to the Court's doubts. For example, as the Government has emphasized, Bestline had no mechanism to enable it to determine routinely whether a participant performed the required supervisory and training functions, nor would one who failed to perform those functions be terminated by the corporation. Deposition of David L. Eastis in *People of the State of California v. Bestline Products, Inc.*, No. 952969 (Sup.Ct.Cal., June 20, 1972), at 74. Furthermore, there were no limits on the number of Local Distributors an individual Local Distributor could sponsor, or on the number of Local Distributors a Direct Distributor could sponsor. Nor was there any geographic limitation on the location of participants one sponsored. As stated in Bestline's Information Manual at page 28, and in later editions at page 23, "you may sponsor people anywhere in the country, and regardless of where they are you will make a profit on their activities, by your continued supervision." Common sense would seem to indicate that the nature and extent of the supervision rendered would become increasingly tenuous and ephemeral as a participant's sales organization became larger and more diffuse. The question is really one of degree. Even were the Court to have adopted defendant's position, at a certain point those purported "bona fide and essential" functions would have become so insignificant that, as a matter of law, they would have been deemed *de minimis* and incapable of supporting even the argument advanced by defendant. If, for example, Local A sponsored Local B, who in turn sponsored Local C and so on to Local G, *quaere* the nature and extent of supervision and assistance rendered by Local A to Local G, or the degree of supervision provided by their Direct or General. *Quaere* also the kind of "necessary and continuing supervision, and sales assistance" a General Distributor provided to another General formerly within his own distribution network so as to justify the continuing 3 per cent commission permitted the former on the latter's sales in the first revised marketing program.

An even more fundamental flaw in defendant's argument—and one more readily

cognizable in the present procedural posture of this case—is the fact that the supervisory and training functions purportedly rendered by participants in Bestline's marketing program were not necessarily essential in the sale and delivery of product to the *ultimate* consumer, as required by paragraph 3 of the Consent Order. When, for instance, an individual opted to become a Direct Distributor by pre-purchasing $5,000 worth of inventory and sales aids, the sponsoring General received a commission of 8 per cent. Yet at that stage in the transaction, no product has yet been sold or delivered to the ultimate consumer. The sale was transacted entirely by persons within Bestline's own marketing structure. Further, it is conceivable that the process would continue on a lower level when the pre-purchase Direct re-sells his inventory to Locals he has sponsored, still without a sale to an ultimate consumer. Despite the lack of such a sale, the General has received $500 in commission.

This is not to say that Bestline did not emphasize the sale of its product to the consuming public. The record clearly shows that the Bestline enterprises generated millions of dollars in retail sales annually. Rather, Bestline's post-Consent Order marketing programs failed to comply with paragraph 3 of the Consent Order by continuing to permit sponsoring distributors to receive consideration in the absence of the sale and delivery of product to the ultimate consumer. Alternatively phrased, sales and delivery of product to the ultimate consumer was not a necessary condition for either the pre-purchase Direct Distributor or the General Distributor to receive financial gain. Accordingly, the Court holds that defendant violated paragraphs 1 and 3 of the Consent Order during the period November 3, 1971, to July 31, 1973.

### B. *Paragraph 4*

Paragraph 4 of the Consent Order directed respondents therein, *inter alia*, to cease and desist from

11. While the Direct Distributor Application referred to the $528 as "General Distributors

"Requiring prospective participants or participants in respondents' said program to purchase the product or pay any other consideration, other than payment for the actual cost of necessary sales materials, in order to participate in any manner therein; * * *."

The Government contends that Bestline's post-Consent Order marketing programs violated the quoted portion of that paragraph by

1. Requiring Direct and General Distributors to pay $25 and $50 a month, respectively, to belong to a marketing co-op;

2. Requiring a Direct Distributor to pay $600 (later increased to $700) to a General Training Fund upon ascending to General Distributor;

3. Requiring new Local Distributors to pay an initial entrance fee of $5; and

4. Allocating $969 of the $2,995 paid by a pre-purchase Direct Distributor for the sponsoring Distributor's discount ($528) and administrative costs ($441), thereby leaving only $2,026 for the purchase of inventory and sales aids.

Defendant argues that

1. Co-op dues were at all times voluntary;

2. The required General Training Fund payment does not come within the scope of paragraph 4 since "it was not required of one desiring to participate in the Bestline marketing program" (Defendant Bailey's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 50);

3. The $5 entrance fee is *de minimis*, and in any event comes within the express exception in paragraph 4 for "actual cost of necessary sales materials";

4. The $528 discount [11] was not prohibited by paragraph 4; and

5. Administrative and processing costs incurred in the operation of the pre-purchase Direct Distributor program merely reflect cost of product.

discount", both the Government and defendant referred to it as a commission.

First, with respect to the monthly co-op dues, the evidentiary materials submitted by the parties clearly establish that these dues were obligatory for Direct Distributors under the first revised marketing program. The Bestline Business Opportunity Booklet utilized while that program was in effect, that is, until February, 1972, explained to prospective participants that:

> "Your monthly operating expenses are minimal in Bestline. Almost all our distributors use their home as their place of business. You most likely will require a car, a telephone and should comply with local and state sales laws. *Direct Distributors are required to pay $25 per month CO–OP dues* which defer expenses for hotel meeting and training rooms." *Id.* at 8 (emphasis added).

A Direct Distributor was explicitly bound by the terms of that booklet by paragraph 33 of the contemporaneous Direct Distributor Agreement, which provided as follows:

> "Distributor acknowledges that he has heretofore received a copy of the Bestline Business Opportunity Booklet and has signed a written receipt for the same. Said booklet is hereby referred to and by such reference incorporated herein and made a part hereof. The terms of said booklet are binding upon the parties hereto as a part of this contract."

■ In the opinion of the Court, these materials establish beyond doubt that, at least until February, 1972, a Direct Distributor was contractually obligated to pay $25 per month co-op dues "in order to participate" in Bestline's marketing program. Under the first revised marketing program these dues were not voluntary as Defendant has argued; nor were they paid for the purchase of product or "necessary sales materials". Therefore, the Court holds that the $25 monthly co-op dues required of a Direct Distributor under the first revised marketing program constituted a violation of paragraph 4 of the Consent Order.

In all other respects, however, the Government has failed to persuade the Court that participation in Bestline's mar-

keting program was conditioned upon the payment of co-op dues. Subsequent to February, 1972, the Bestline Business Opportunity Booklet was revised, stating only that "Distributors *usually* join a local Co-Op, paying monthly dues of $25 for a Direct Distributor and $50 for a General Distributor." *Id.* at 8 (emphasis added). In its brief, the Government points to the following language included in the opportunity meeting scripts in support of its contention that the payment of co-op dues remained compulsory:

> "We, as General Distributors, belong to the Co-op and pay $50 per month dues (a Direct pays only $25) which pays for the expenses of our meeting rooms and training sessions which is truly an economical expense for overhead. We conduct meetings like you saw last night and this morning on a continuous basis right here in _____. And, because you are a member of the Co-op, you use this way to introduce your guests to Bestline, attend Saturday training sessions, retail schools, local schools and our family night functions and it's quite effective.
>
> "So, let's say that you do that."

Although that language is strongly suggestive and may have induced a prospective participant into believing that co-op dues were mandatory, the Court is unwilling to hold as a matter of law that that necessarily occurred and, therefore, that paragraph 4 was further violated.

■ Second, with respect to the $600–$700 payment to the General Training Fund, it is defendant's position that that payment did not violate paragraph 4 since a Direct Distributor could continue to participate indefinitely in Bestline's marketing program as a Direct, thereby avoiding having to attend Bestline's General Distributor School. To be sure, only when a Direct voluntarily chose to become a General was the $600–$700 Training Fund payment required. But defendant's argument really begs the question. Paragraph 4 of the Consent Order explicitly prohibits Bestline from requiring participants to pay *any* consideration, other than for the actual cost of

necessary sales materials in order to participate *in any manner* in Bestline's marketing program. The Court cannot imagine any more inclusive language than that used in the Consent Order. Participation as a General Distributor is clearly encompassed by the phrase "in order to participate in any manner." Defendant's interpretation of paragraph 4 is thus totally inconsistent with the plain language of that paragraph. Accordingly, the Court holds that the $600–$700 payment to the General Training Fund admittedly required of a Direct who wished to ascend to General Distributor violated paragraph 4 of the Consent Order.

Third, the Court agrees with defendant that the $5 initial fee required of new participants, purportedly for an Associate Membership in Bestline's Distributors' Association, is *de minimis*. However, the Court wishes to make clear that it expresses no opinion on whether that payment was in consideration for "necessary sales materials" as defendant maintains. There is nothing before the Court that would justify such a finding, save for defendant's own declarations and the similar representation of Bestline in the corporation's Supplemental Compliance Report, submitted to the Commission on June 24, 1972.

The fourth alleged violation of paragraph 4 of the Consent Order—the allocation of $929 of the $2,995 paid by a pre-purchase Direct Distributor for administrative and processing costs and the General Distributor's commission—presents some difficulty. The Court is inclined to agree with defendant that the $528 commission paid to the sponsoring distributor does not properly fall within the scope of paragraph 4. If, as the Government contends, the commission payable upon the purchase of product by a pre-purchase Direct violated paragraph 4 of the Order, then it would seem to follow logically that all commissions paid—either directly, as here, or indirectly in the form of variable discount rates—whenever a Local or Direct Distributor purchased product from Bestline, were

equally violative of paragraph 4, for all would be "consideration [paid] in order to participate in any manner" in Bestline's marketing program. The Court believes, however, that when the Consent Order is taken as a whole, the payment of commissions, discounts and the like is a matter dealt with more directly, and in considerable more detail, in paragraph 3 of the Order. Therefore, the Court declines to stretch the general language of paragraph 4 to prohibit the payment of commission upon the purchase of product.

With respect to the $441 paid for "administrative and processing costs", it is defendant's position that these costs merely reflected a portion of total product cost, "the necessary costs of processing, handling, shipping, and bookkeeping, which are normally incidental to the distribution of products." Defendant Bailey's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 52. The circumstances surrounding the administration of the pre-purchase Direct Distributor program, however, belie that contention. Paragraph 4 of the Consent Order provided, *inter alia*, that

> "respondents may require or may suggest the purchase of specific and reasonable inventories only, by any distributor, on the express condition that respondents at the same time agree to repurchase any unused and undamaged portion of an initial inventory from any purchaser thereof at full cost less reasonable shipping costs, if any, within 90 days from the delivery of the product at the option of the purchaser * * *."

It is undisputed that from May, 1971 until February, 1972 Bestline operated a 90-day refund program, and that a pre-purchase Direct Distributor requesting a refund automatically received $2,026, less the value of any product used. However, neither the $441 paid for administrative and processing costs nor the $528 commission paid to the General Distributor were refunded. Affidavit of James Hisler, at 2, attached to Defendant's Supplemental Memorandum in

Opposition to Plaintiff's Motion for Partial Summary Judgment.[12]

The Government has not charged defendant with a violation of paragraph 4's 90-day refund requirement and, for the purposes of this discussion, the Court assumes that the refund program operated by Bestline complied with the Consent Order.[13] Given that assumption, and given the requirement in paragraph 4 that Bestline refund the full cost of initial inventory (less reasonable shipping costs and the value of product used or damaged), the only conclusion logically permissible is that the amount refunded— $2,026—represented the full cost of product inventory. In that case, defendant's contention that the $441 charge was but a part of product cost necessarily fails.

Accordingly, the Court concludes that the requirement that a pre-purchase Direct Distributor pay $441 for "administrative and processing costs" violated paragraph 4 of the Consent Order in that that payment was consideration required for participation in Bestline's marketing program. The Court holds that for the reasons set forth above, defendant failed to comply with paragraph 4 of the Consent Order during the period November 3, 1971, to July 31, 1973.

## C. *Paragraph 5*

As set forth in footnote 2 herein, paragraph 5 of the Consent Order prohibited respondents from using a multi-level marketing program wherein the compensation or profit inuring to participants was "dependent on the element of chance dominating over the skill or judgment of the participants"; or where "no amount of judgment or skill exercised by the participant has any appreciable effect" upon his compensation; or where "the participant is without that degree of control over the operation of such plan as to enable him substantially to affect the amount" of his compensation. The Government charges a violation of paragraph 5 in that, as Bestline's marketing programs were structured,

12. Mr. Hisler's affidavit states that part of his responsibility as manager of operations for Bestline Products, Inc., was the administration of Bestline's 90-day refund program.

13. The Court notes in passing, however, that the evidentiary materials presently before the Court appear to establish a firm basis upon which to found non-compliance with the 90-day refund requirement. The Government and defendant agree that that issue is not before the Court at this time; it was mentioned neither in the First Amended Complaint, nor in the Government's Motion for Partial Summary Judgment, nor at oral argument. Nevertheless, the affidavit of Mr. Hisler strongly suggests that Bestline's refund program did not comply with the Consent Order until March, 1973.

As outlined in the text, under the first revised marketing program, neither the $441 paid for administrative and processing costs nor the $528 paid to the sponsoring General Distributor were refundable. At a minimum, it would seem that paragraph 4, which required the repurchase of initial inventory "at full cost", mandated that the amount allocated for the General's commission be refunded to the participant if he elected to exercise the 90-day refund option clearly afforded him by the Consent Order.

Furthermore, under the program in effect from February, 1972 to February, 1973, the Candidate Direct Distributor initially purchased $500 of product and then, after a minimum seven-day period, submitted a Direct Distributor application together with $2,995 for additional product. Once the second purchase was made, the sums paid to Bestline became non-refundable. The Court surmises that the split purchase procedure utilized in the second revised marketing program may well have been adopted in reliance upon the final clause of paragraph 4, which provided that

"if inventory costs reach $500 or more, within said 90 day period, then said obligation to repurchase shall cease immediately upon participant's tendering a subsequent order to purchase the product."

This Court seriously doubts whether the refund procedures utilized between February, 1972 and February, 1973—which appear to have been tailored solely to subvert the spirit, if not the very letter, of paragraph 4—would be deemed in compliance with the Consent Order. It was not until March, 1973, when the third revised marketing program took effect, that a Direct Distributor was entitled to refund of the *full* amount paid for wholesale inventory. Affidavit of James Hisler, at 2.

In light of these facts, the Court utterly fails to comprehend the Government's inexplicable failure to charge defendant with a violation of the 90-day refund requirement set forth in paragraph 4 of the Consent Order.

"Two factors, over which the participant exercises no control, are vitally significant in assessing one's chances of achieving large financial rewards—(1) time of entry into the marketing program; (2) intensity of pre-entry recruitment efforts. Since a participant cannot exercise control over these two components of profit, the element of chance dominates over skill and judgment in determining a participant's profits." Plaintiff's Motion for Partial Summary Judgment against Defendant Bailey, at 38.

In effect, the Government argues that any program which permits the number of participants to increase geometrically through continued recruitment inevitably results in an increasingly saturated market; that the more highly saturated the market, the more difficult it is for a participant to gain financially; and that the particular level of saturation confronting a participant is a function of factors over which he has no control.

Defendant quite rightly points out that the Government's position is entirely abstract and theoretical. There is nothing before the Court tending to establish the saturation level of any identifiable geographic market at any one point in time or across time. It may well have been the case that the per capita distribution of Bestline participants remained relatively constant over time and, therefore, that time of entry into the Bestline marketing programs had no effect upon a participant's financial gain. Certainly there is nothing to establish that the number of participants increased exponentially. In short, in the absence of any showing of the actual market saturation, there is no basis for holding, as a matter of law, that Bestline's marketing programs as structured violated paragraph 5 of the Consent Order.

### D. Paragraph 6(a)

The Government contends that Bestline's revised marketing programs failed to comply with paragraph 6(a) of the Consent Order in several respects:

1. Participants were not orally informed that a contract of participation in the program could be cancelled for any reason by notification to Bestline within three working days from the date of its execution;

2. All written contracts did not contain notice of the three-day cancellation right; and

3. Participants were not, in fact, afforded such a right.

Defendant takes issue with each of these contentions.

First, with respect to the oral disclosure requirement, the Government relies primarily upon the fact that none of the scripts utilized at opportunity meetings instructed the speaker to inform prospective participants of the cancellation right. Defendant, however, stresses that the scripts specifically directed the speaker to refer the members of his audience to pages 14 and 15 of the Bestline Business Opportunity Booklet,[14] entitled "Policies and Procedures Affecting Distributors," where it was stated that

"Any distributor may for any reason, cancel his contract of participation within three (3) working days from the date such contract was signed, upon written notice to Bestline. Full refund of all monies will be made upon written notice."

The oral reference to that written statement, in defendant's view, satisfies the oral disclosure requirement of paragraph 6(a).

Furthermore, defendant contends that the Government has by no means estab-

---

**14.** The script utilized until February, 1972 contained no such passage. However, the second revised opportunity meeting script included the following language at page 8:

"Before attending tomorrow's meeting, each of you will want to read the Bestline Business Opportunity Booklet which will be handed out this evening. The booklet contains not only an explanation of some of the things we discussed this evening, but on pages 14 and 15, the rules and regulations which affect all distributors."

The script utilized after February, 1973 contained a virtually identical passage at page 7.

lished that participants were not in fact orally informed of their cancellation right. Defendant admits that the opportunity meeting scripts "were generally adhered to at opportunity meetings." Defendant Bailey's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 60. However, he denies that they were "slavishly adhered to" and maintains instead that speakers "often if not always" informed those who attended the meetings of the three-day cancellation right. *Id.* at 60. In support of this contention, defendant has submitted the affidavit of Toro Ikeda, a Bestline officer, who stated, at page 3, that at the opportunity meetings he attended he affirmatively told the audience of the three-day cancellation right. Defendant has also submitted the affidavit of Stephen Meyers, a Bestline General Distributor, who stated, at page 3, "At least 90 per cent of the times I heard it stated at these opportunity meetings that there was a three day cancellation right." These affidavits clearly establish, in defendant's view, that a genuine issue of material fact remains as to whether oral disclosure of the cancellation right was made to all prospective participants.

■ The Court is not persuaded by defendant's reasoning. In the Court's opinion, an oral exhortation to consult a written publication, at that time not yet even in the hands of the listener, does not as a matter of law satisfy the oral disclosure requirement of paragraph 6(a). Were such an oral cross-reference to be held to constitute oral disclosure, it would seriously dilute the additional emphasis the Commission intended, and defendant consented, to give to the three-day cancellation right by requiring *both* written and oral disclosure of that important contractual right.

■ The Court is similarly unpersuaded by defendant's contention that a genuine issue of material fact remains as to whether participants were informed orally of the three-day cancellation right. Paragraph 6(a) of the Consent Order imposed upon defendant the affirmative obligation of op-

erating a marketing program wherein *all* participants would be notified orally and in writing of that right. The simplest manner to assure compliance with that requirement clearly would have been to include in the opportunity meeting scripts an explicit, unambiguous statement setting forth the existence of that right. This defendant chose not to do, relying instead upon the hope that all speakers would deviate from the prepared script and inform participants of their cancellation right. That his decision was risky, and ultimately ill-advised, is highlighted by the evidentiary materials defendant himself has submitted, for even his own affiant, Stephen Meyers, has implicitly conceded that at a certain percentage of the opportunity meetings he attended—perhaps as many as 10 per cent—he cannot recall hearing the required oral disclosure. This evidence alone is sufficient to establish a violation of paragraph 6(a), which requires unequivocally that "all participants" shall be informed orally of the three-day cancellation right.

■ As for the written contracts of participation Bestline used, the Court does not agree with the Government that the failure to include the three-day cancellation right directly in the General Distributor Agreement used during the first revised marketing program was a violation of paragraph 6(a). That agreement specifically incorporated by reference both the terms of the Direct Distributor contract and of the Bestline Business Opportunity Booklet. General Distributor Agreement, ¶¶ 23 and 26. Both of those documents contained the requisite three-day cancellation clause. *See* Direct Distributor Agreement, ¶ 14(c); Bestline Business Opportunity Booklet, at 15. In the opinion of the Court, the written contracts of participation Bestline used prior to February, 1972, complied with paragraph 6(a) of the Consent Order.

Such is not the case, however, with the Direct and General Distributor Agreements utilized subsequent to February, 1972, because each of those Agreements was made

self-executing.[15] The inclusion of a self-executing provision completely undermined the three-day cancellation right defendant agreed to accord all participants. The fatal defect was not, as the Government maintains, that the contract might have been delayed in the mail, thereby reducing the time in which the cancellation right could be exercised to something less than three days. Rather, a self-executing contract of the type used in the second and third revised marketing programs rendered a prospective participant absolutely bound by the terms of the contract, with no right to cancel, even if he merely chose to ponder his decision and did nothing to execute the contract during the five (later six) day period following the date on which the contract was mailed to him.

This is clearly not the situation envisioned by the Consent Order. Paragraph 6(a) provided that the three-day cancellation period would run "from the date of execution of such contract." If that language is to be given its natural and common sense meaning, it contemplates that any participant would have an absolute right to cancel the contract for three days following his decision to participate in Bestline's marketing program, that is, from a layman's perspective, his decision to sign on the dotted line. Indeed, the Bestline Business Opportunity Booklet promised no less: it assured all prospective participants that they would have the right to cancel the contract within three days of the date the contract was *signed*, and this is the precise language contained in the Direct Distributor agreement used during the first revised marketing program.[16] If, as defendant maintains, Bestline was genuinely concerned that the company not accept a prospective Direct Distributor's offer, cash his check, commit itself by paying the commission to the sponsoring General Distributor, and ship the product to the new participant, only to discover at some remote date that the prospective Direct had only then signed the contract and within three days had exercised his cancellation right, Bestline could easily have refrained from taking any of those actions until the contract was finally binding, as any prudent businessman would have done. And, if Bestline was concerned that a prospective Direct "could sit on top of the Direct Distributor Agreement without executing it," Defendant Bailey's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 66, the contract could easily have provided that the failure to execute the contract within a given period of time would constitute a revocation of the offer. But instead, defendant approved a self-executing provision. By including such a provision in all contracts used after February, 1972, defendant attempted—perhaps successfully in some cases—utterly to frustrate the exercise of a prospective participant's three-day cancellation right. This the Consent Order did not permit, nor can the Court condone.

The Court holds that defendant violated paragraph 6(a) of the Consent Order by failing to inform orally all participants of their three-day cancellation right and by failing to provide for that right in all written contracts of participation.

### E. *Paragraph 12(a)*

Paragraph 12(a) of the Consent Order prohibited

> In the third revised marketing program the self-executing clauses in both the Direct and General Distributor agreements were changed to provide that the date of execution would be three days after the mailing date.

---

**15.** The Direct Distributor Agreement used in the second revised marketing program provided in paragraph 13(c) that for all purposes, including the three-day cancellation right, the contract "shall be considered to have been executed two (2) days after the date on which it is mailed, duly executed on behalf of the Company, by certified mail to the prospective distributor's last known address." The General Distributor Agreement used during the same time period contained similar language in paragraph 16(c).

**16.** Paragraph 14(c) of that contract provided as follows:

"This contract may be cancelled for any reason, within three (3) working days from the date such contract was signed, upon written notice to Bestline Products, Inc., P.O. Box 6416, San Jose, California 95150."

"Failing to disclose, orally and in writing, the terms of this order to cease and desist to all present and future distributors, salesmen or other persons engaged in the sale of respondents' products, services, or merchandising programs, and securing from each such distributor, salesmen [*sic*] or other person a signed statement evidencing receipt of said disclosure."

It is the Government's theory that because Bestline's post-Consent Order marketing programs violated other paragraphs of the Order, "it is axiomatic that defendant violated Paragraph 12(a) of the Order." Plaintiff's Motion for Partial Summary Judgment Against Defendant Bailey, at 47. Specifically, the Government maintains that no opportunity meeting script or Bestline Business Opportunity Booklet accurately informed citizens of the conduct prohibited by paragraphs 1, 3, 4, 5, and 6(a) of the Consent Order and, therefore, that defendant has violated paragraph 12(a) as well.[17]

■ The Court does not share the Government's belief that a violation of paragraph 12(a) would follow axiomatically from violations of other paragraphs of the Consent Order. It could have been true that while Bestline's revised marketing programs did not themselves comply with the terms of the Order, all participants were nevertheless accurately and fully apprised of those terms. The Court grants that such a situation would be unusual, but because it is not foreclosed by the circumstances of this case, the Court refuses to hold as a matter of law that a violation of another portion of the Consent Order necessarily implies a violation of paragraph 12(a).

■ Turning, then, to the evidentiary materials upon which the Government relies—the opportunity meeting scripts and the Bestline Business Opportunity Booklets—the Court does not feel that the oral disclosure issue can be resolved solely by reference to those materials, for the possibility remains that speakers at the opportunity meetings deviated from the scripts and spoke extemporaneously, or informed participants of the terms of the Order on other occasions. The question of what was told to participants is essentially one of fact, and although the trier of fact would undoubtedly accord substantial weight to the contents of the opportunity meeting scripts, they are an insufficient basis in themselves upon which to found, as a matter of law, a violation of the oral disclosure requirement of paragraph 12(a).

■ As for the written disclosure requirement, defendant relies entirely upon the contents of pages 14 and 15 of the Bestline Business Opportunity Booklets. All Direct and General Distributors acknowledged in writing, in the General and Direct Distributor Agreements, that they had received, read and understood a copy of that Booklet. The record is silent, however, on whether or not Local Distributors were given a copy of the Booklet; it is similarly silent on whether or not participants who were already Direct or General Distributors at the time the Consent Order became effective—and therefore would not have had occasion to contract anew with Bestline—received that Booklet or otherwise acknowledged receipt of a written copy of the terms of the Consent Order. Assuming, though, that all participants received and acknowledged receipt of a copy of the Business Opportunity Booklet, the question remains whether the information set forth therein adequately complies with the requirement of paragraph 12(a) that the terms of the Consent Order be disclosed.

The Court believes that this question must be answered in the negative. Defendant argues that the statement of "Policies and Procedures Affecting Distributors" on pages 14 and 15 of the Booklet "adequately paraphrases" the terms of the Consent Order. Defendant Bailey's Memorandum in Opposition to Plaintiff's Motion for Partial

17. The Government does not argue, nor could it in the face of the language of paragraph 12(a), that defendant was obligated to disclose the *existence* of the Consent Order. Paragraph 12(a) requires only the disclosure of the *terms* of the Order.

Summary Judgment, at 70. Defendant, of course, was not obligated by paragraph 12(a) to quote the terms of the Consent Order verbatim in the written disclosure to participants. However, by paraphrasing those terms he assumed the risk that the language employed would fail, as a matter of law, adequately to inform participants of those terms. The Court concludes that this occurred. For example, on page 14 of the Bestline Business Opportunity Booklet used during the second revised marketing program, participants were told that:

"Under certain conditions, and in accordance with the provisions of this agreement, a distributor shall have the option to, at any time within three months after the date of receipt of order, return the unused portion, undamaged, of his initial inventory to Bestline Products, Inc., for refund. Further details concerning refunds may be obtained from Bestline's Corporate Offices in San Jose, California."

Presumably, this passage was intended to paraphrase the 90-day refund requirement of paragraph 4 of the Consent Order. Omitted, however, is any reference to the fact that once inventory costs reached $500 or more within the 90-day period, Bestline's obligation under the Consent Order to repurchase unused inventory immediately ceased upon a participant's subsequent purchase of product. In view of the split purchase procedure for Candidate Direct Distributors adopted under the second revised marketing program, discussed in footnote 13, *supra*, the limited disclosure on page 14 of the terms of the 90-day refund provision is inadequate. Other instances of inadequate disclosure could be mentioned, as, for example, the omission from the Bestline Business Opportunity Booklet utilized prior to February, 1972, of any explicit mention that no consideration would be paid for the recruitment of others into the Bestline marketing program. In sum, the careful, guarded language contained on pages 14 and 15 of the Booklet, even if distributed to all participants in the program, fails to satisfy the written disclosure requirement

of paragraph 12(a). Accordingly, the Court holds that defendant did not comply with that portion of the Consent Order.

IV. *Conclusion*

To recapitulate, the Court holds that:

1. Defendant violated paragraph 1 of the Consent Order by operating a marketing program from November 3, 1971, to July 31, 1973, wherein the financial gains to participants were dependent upon recruitment of other participants;

2. Defendant violated paragraph 3 of the Consent Order by operating a marketing program from November 3, 1971, to July 31, 1973, wherein consideration was paid to participants who did not perform a bona fide and essential supervisory, distributive, selling or soliciting function in the sale and delivery of product to the ultimate consumer;

3. Defendant violated paragraph 4 of the Consent Order by requiring Direct Distributor participants to pay monthly co-op dues of $25 during the period November 3, 1971, to February 29, 1972;

4. Defendant violated paragraph 4 of the Consent Order from November 3, 1971, to July 31, 1973, by requiring Direct Distributors who wished to ascend to General Distributor to make payments to the General Training Fund;

5. Defendant violated paragraph 4 of the Consent Order from November 3, 1971, to February 29, 1972, by allocating $441 of the sum paid by a pre-purchase Direct Distributor for administrative and processing costs;

6. Defendant violated paragraph 6(a) of the Consent Order from November 3, 1971, to July 31, 1973, in that all participants were not orally informed that all contracts of participation could be cancelled within three working days from the date the contract was executed;

7. Defendant violated paragraph 6(a) of the Consent Order from March 1, 1972, to July 31, 1973, in that all contracts of participation did not provide that the contract could be cancelled within three working

days from the date the contract was executed; and that

8. Defendant violated paragraph 12(a) of the Consent Order during the period November 3, 1971, to July 31, 1973, by failing to disclose in writing to all participants the terms of the Consent Order.

It may well be that none of these violations were willful or deliberate, but that defendant attempted in good faith to comply with all of the terms of the Consent Order and simply misunderstood both the scope of the Order and his obligations thereunder. The Court, of course, will not prejudge those issues; however, they concern matters which are relevant only in the determination of the severity of the penalty to be imposed. They cannot excuse defendant's extensive and continued non-compliance with the Commission's Order. Accordingly,

IT IS HEREBY ORDERED that defendant's motion for partial summary judgment is denied.

IT IS HEREBY FURTHER ORDERED that the Government's motion for partial summary judgment with respect to paragraph 5 of the Consent Order is denied.

IT IS HEREBY FURTHER ORDERED that the Government's motion for partial summary judgment with respect to paragraphs 1, 3, 4, 6(a) and 12(a) of the Consent Order is granted as hereinabove set forth.