UNITED STATES of America, Appellee,

v.

READER'S DIGEST ASSOCIATION, INC., Appellant.

No. 80–2445.

United States Court of Appeals, Third Circuit.

Argued April 21, 1981.

Decided Aug. 24, 1981.

Sur Petition for Rehearing Sept. 16, 1981.

Certiorari Denied Jan. 18, 1982. See 102 S.Ct. 1253.

Noble K. Gregory (argued), William I. Edlund, Charles R. Ragan, Pillsbury, Madison & Sutro, San Francisco, Cal., Edward F. Mannino, Karen Marek McAlinn, Dilworth, Paxon, Kalish & Levy, Philadelphia, Pa., R.

Franklin Balotti, Donald A. Bussard, Richards, Layton & Finger, Wilmington, Del., for appellant.

Susan J. Atkinson (argued), Robert B. Nicholson, Benjamin P. Schoen, Attys., Sanford M. Litvack, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for appellee.

Before HUNTER, VAN DUSEN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This is an appeal from a final order of the United States District Court for the District of Delaware, which assessed a penalty of $1,750,000 against the Reader's Digest Association, Inc. ("the Digest") for multiple violations of a Federal Trade Commission ("FTC") consent order, and also enjoined the company from further violations. We will affirm.

### I.

In 1970, the FTC initiated an investigation of the Digest's direct-mail solicitation campaigns. Characteristically, the solicitations involved the mass mailing of sweepstakes promising money or merchandise to a small percentage of those who returned the sweepstakes entry forms. At the conclusion of its investigation one year later, the FTC notified the Digest that it found the company's sweepstakes promotions to be unfair and deceptive, and that it intended to charge the Digest with violating section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1976):[1]

The FTC did issue an administrative complaint on November 2, 1971, but the complaint was contained within a settlement agreement between the agency and the Digest to enter into a cease and desist order. The agreement stated that the order was entered into for settlement purposes only, and did not constitute an admission that the Digest had violated any law. The parties also agreed that the consent order would be construed in light of the administrative complaint.

One of the allegations in the complaint stated that the Digest had represented that "[s]imulated checks, 'money' and other negotiable instruments and simulated 'New Car Certificates'" were "valuable and [could] be cashed, redeemed, or exchanged for United States currency or a new car," when in fact the documents were not valuable, and could not be cashed, redeemed, or exchanged for currency or a new car. Appendix at 27a; 30a. The complaint included an example of one of the Digest's simulated checks, which is reprinted in appendix 1 of this opinion. The corresponding provision of the consent order required the Digest to cease and desist from *"[u]sing or distributing simulated checks, currency, 'new car certificates;' or using or distributing any confusingly simulated item of value."* Appendix at 38a. (emphasis added).

In the first half of 1973, the Digest initiated a "Sweepstakes Passport" promotion. As part of the promotional pamphlet, the Digest mailed millions of "travel checks" which purported to pay a grand prize winner in the sweepstakes "one hundred dollars a month for life." A specimen check is reprinted in appendix 2 of this opinion.

On April 13, 1973, an FTC staff attorney informed the Digest that the travel checks were "clearly violative" of the portion of the consent order prohibiting the dissemination of simulated checks or confusingly simulated items of value. Appendix at 728a. The FTC met with the Digest's then associate general counsel, Mari Ann Blatch, on May 2, 1973, at which time the Commission's objections to the promotion were voiced. On May 7, 1973, Blatch informed the FTC that the Digest, "while not admitting that the 'travel check' in any way violates C–2075 [the consent order]," would discontinue their use after June 30, 1973. Appendix at 763–64a. The company then proceeded to complete its mailing of the

---

[1]. 15 U.S.C. § 45(a)(1) (1976) provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

"Sweepstakes Passport" promotion, sending out over four million travel checks between May 7, and June 30, 1973.

In September and November, 1974, the Digest distributed approximately two million "cash-convertible bonds" as part of a new sweepstakes campaign. The Digest enclosed three different bonds in each packet, one purporting to award a grand prize winner "one hundred dollars a month for life," another for $24,000.00, and a third for "$2,000.00 a month for a year." The first of these bonds is reprinted in appendix 3 of this opinion. The FTC did not contact the Digest about the bonds at the time of the mailing.

On July 7, 1975, the Government filed a complaint in district court pursuant to sections 5(*l*) and 16(a)(1) of the Federal Trade Commission Act, 15 U.S.C. §§ 45(*l*) and 56(a)(1) (1976), to recover penalties for violations of the cease and desist order, and to secure injunctive relief.[2] Appendix at 7–10a. The complaint charged that the Digest had violated the consent order by distributing several million "simulated checks," and several million "confusingly simulated items of value."

Following discovery, the Digest moved for summary judgment, and the Government moved for partial summary judgment on the issue of liability. On November 28,

1978, the district court granted the Government's motion for summary judgment on liability. *United States v. Reader's Digest Association, Inc.,* 464 F.Supp. 1037 (D.Del. 1978). The court held that the consent order entered into between the FTC and the Digest "was meant to apply to advertising material that is similar to the items mentioned in the complaint and, on its face, could be said to have the same capacity to mislead consumers." *Id.* at 1047. Thus, the court rejected the Digest's contention that the Government had to prove that the travel checks and cash-convertible bonds had actually deceived consumers. Chief Judge Latchum also rejected the Digest's argument that the challenged documents were commercial speech protected by the first amendment. The district court then examined the travel checks and bonds, and concluded that, in terms of their tendency to deceive consumers, they were indistinguishable from the original check giving rise to the consent order.

Following further discovery, the district court held a penalty hearing in May, 1980. After considering the factors set forth by this court in *United States v. Papercraft Corporation,* 540 F.2d 131, 141 (3d Cir. 1976), the district court concluded that the Digest had been guilty of 17,940,521 viola-

---

**2.** 15 U.S.C. § 45(*l*) (1976) provides:

Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.

The 1973 Amendment to this statute raised the maximum penalty for each violation from $5,000 to $10,000, and added the last sentence

empowering the district courts to grant mandatory injunctions and further equitable relief.

15 U.S.C. § 56(a)(1) (1976) provides:

Except as otherwise provided in paragraph (2) or (3), if—

(A) before commencing, defending, or intervening in, any civil action involving this chapter (including an action to collect a civil penalty) which the Commission, or the Attorney General on behalf of the Commission, is authorized to commence, defend, or intervene in, the Commission gives written notification and undertakes to consult with the Attorney General with respect to such action; and

(B) the Attorney General fails within 45 days after receipt of such notification to commence, defend, or intervene in, such action; the Commission may commence, defend, or intervene in, and supervise the litigation of, such action and any appeal of such action in its own name by any of its attorneys designated by it for such purpose.

tions of the consent order. In other words, the district court held that each letter distributed in the Digest's mass mailings constituted a separate violation. The court assessed a penalty of $1,750,000, and issued a permanent injunction against further violations of that portion of the consent order. *United States v. Reader's Digest Association, Inc.*, 494 F.Supp. 770 (D.Del. 1980). The district court denied the Digest's post-trial motions. This appeal followed.[3]

## II.

Four issues are presented in this appeal. First, did the district court err by granting the Government's motion for summary judgment on the issue of liability? Second, does the district court's finding that the travel checks and cash-convertible bonds violated the consent order impinge upon constitutionally protected commercial speech? Third, did the district court conclude correctly that each individual mailing constituted a separate violation of the consent order, and did it abuse its discretion by imposing a penalty of $1,750,000 upon the Digest? Finally, did the district court abuse its discretion by granting an injunction against future violations of the consent order? We will examine each of these issues separately.

### A. *Summary Judgment*

The Digest maintains that the district court erred by granting the Government's motion for summary judgment on the issue of liability. Appellant challenges the district court's construction of the order, contending that the ban on dissemination of "confusingly simulated item[s] of value" required the government to offer proof of actual confusion of consumers, not just a

tendency to confuse. The Digest also claims that the question of whether the travel check and cash-convertible bonds violated the consent order was not ripe for summary adjudication because of the existence of genuine issues of material fact. Specifically, the company argues that there was a genuine dispute as to whether the travel check was a "simulated check," and whether the bonds were "confusingly simulated item[s] of value" within the prohibition of the consent order.

In determining whether the travel check and cash-convertible bonds violated the consent order, the district court properly engaged in a two-step inquiry: (1) construction and interpretation of the consent order itself; and (2) whether the challenged documents fell within the order's proscription. *United States v. J. B. Williams Company, Inc.*, 498 F.2d 414, 430–31 (2nd Cir. 1974). In construing the terms of the order, the lower court observed that the language was "not a model of clarity," and did "not indicate whether or not the term 'confusingly' was meant to impose upon the FTC the burden of proving actual confusion to establish a violation." *Reader's Digest*, 464 F.Supp. at 1045–46. The district court concluded that the resolution of ambiguities in the order depended upon the intent of the FTC and the Digest at the time that they negotiated the order.

■ The Digest asserts that ambiguities in the terms of a consent order, like those in a contract, can be resolved only at trial, not by summary adjudication. *See e. g., Landtect Corporation v. State Mutual Life Assurance Company of America*, 605 F.2d 75, 79–80 (3d Cir. 1979). While appellant recites correctly an accepted principle of con-

3. The Digest maintains that the district court's finding that there were 17,940,521 violations of the consent order is incorrect. It states that its amended answers to the Government's interrogatories establish that it mailed only 16,100,-820 items: 15,894,278 travel checks and cash-convertible bonds in bulk mailings; and 206,-542 travel checks and bonds in test mailings. After entry of judgment, the Digest, in a motion for relief from judgment, requested that the penalty be reduced to not more than $1,610,082

to reflect the accurate number of violations. The district court denied the motion. While conceding that in fact only 16,100,820 violations occurred, the court stated that this did not alter its conclusion that a penalty of $1,750,000 was "wholly proper and reasonable." The court rejected the Digest's contention that it had arrived at the penalty by simply assessing the company 10 cents per violation. *See* Appendix at 842–46a.

tract law, it is nonetheless undisputed that construing the meaning of a consent order, even an ambiguous one, is a question of law for the court, capable of resolution in summary judgment proceedings. *Williams*, 498 F.2d at 431 ("what the order means [is] concededly a task for the court"); *United States v. Golden Fifty Pharmaceutical Co., Inc.*, 421 F.Supp. 1199, 1201–02 (N.D.Ill. 1976). *See also* Comment, *The Right to a Jury Trial in FTCA Section 5(l) Civil Penalty Actions*, 60 Iowa L.Rev. 378, 390–91 (1974) ("*Williams* affirmed the general rule that the [interpretation of the consent order] is a question of law to be decided by the court sitting without a jury."). Thus, the district court properly undertook the task of interpreting the consent order.

█ In construing the consent order, the district court scrutinized the underlying administrative complaint issued by the FTC. Although a consent order must ordinarily be interpreted by examination of only the "four corners" of the document, *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), the complaint may be used as an aid in construction when the parties so provide. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). The agreement containing the consent order at issue here expressly stated that the "complaint may be used in construing the terms of the order." Appendix at 34a. Accordingly, it was proper for the district court to examine the complaint in order to interpret the consent order.

The complaint reproduced some of the deceptive promotional materials disseminated by the Digest. Among other things, the complaint contained a simulated check that provided the sweepstakes winner with one hundred dollars a month for life (appendix 1 to this opinion), and a "New Car Certificate" for a 1970 Ford Mustang. These documents were said to be "typical and illustrative of the statements and representations" made by the Digest in its sweepstakes promotions. Appendix at 20a. The complaint then alleged that through these materials "and others of similar import and

meaning not expressly set out herein," the Digest had represented directly or impliedly that "[s]imulated checks, 'money' and other negotiable instruments and simulated 'New Car Certificates' received by individuals from [the Digest] are valuable and can be cashed, redeemed, or exchanged for United States currency or for a new car." Appendix at 26–27a. The complaint concluded by asserting that these promotional practices by the Digest had "the capacity and tendency to mislead members of the purchasing public ... and ha[d] induced many members of the public to participate in [the Digest's] 'sweepstakes,'" in violation of section 5 of the Federal Trade Commission Act. Appendix at 31a.

Reading the consent order against the background provided by the complaint, the district court concluded that the order intended to prevent the distribution of simulated checks, money, and new car certificates similar to those reproduced in the complaint, and all other confusingly simulated items of value. The court concluded that "the adjective 'confusingly' was meant to modify the specific items mentioned in the first clause of the paragraph [that is, simulated checks, currency, and new car certificates], and that those items are simply examples of material generically described in the second clause as 'confusingly simulated item[s] of value.'" *Reader's Digest*, 464 F.Supp. at 1046. Thus, the trial court read the second part of the consent order's prohibition as an attempt to generalize the proscription contained in the first part.

The Digest, on the other hand, disputes the district court's reading of the order's prohibition of the dissemination of "confusingly simulated item[s] of value." The company maintains that the language of the consent order barred only those items which could be shown to have actually confused consumers. It argues that the order requires the Government to introduce evidence of actual confusion of consumers—evidence which was not adduced by the Government in this action.

We agree with the district court's reading of the consent order: the order does not require the Government to prove that the challenged material actually deceived or confused consumers. *Beneficial Corporation v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). A consent order must be interpreted in light of its principal purpose. *Williams*, 498 F.2d at 431. As the trial court observed, "[t]he prohibited goal in this case was the inducement of participation in sweepstakes by means of items that appeared to be valuable but in fact were not." *Reader's Digest*, 464 F.Supp. at 1047. The phrase "confusingly simulated item of value" was, as the district court held, intended to apply to promotional material that was similar to the items reproduced in the administrative complaint, and on its face, could be said to have the same capacity or tendency to mislead consumers. While proof of actual confusion of consumers would be probative of a tendency to mislead, it is not required. *Beneficial Corporation*, 542 F.2d at 617; *Resort Car Rental System, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).[4] Thus, we conclude that the district court properly construed the relevant portion of the consent order.[5]

As we observed above, the question of whether the Digest violated the consent order is a bifurcated one. Having decided that the district court properly construed the terms of the order, we move to the second part of the inquiry—whether the travel check and cash-convertible bonds fell within the order's proscription against sim-

ulated checks and confusingly simulated items of value. The Digest asserts that this issue could not be determined on a motion for summary judgment because of the existence of disputed facts.[6] The company takes the position that whether the travel check was a "simulated check," and whether the cash-convertible bonds were "confusingly simulated item[s] of value," are factual questions which, when disputed, can be resolved only after plenary review. The district court, on the other hand, determined these were questions for the court, capable of resolution in summary proceedings. For the reasons articulated below, we concur in the conclusion reached by the district court.

In *United States v. Hindman*, 179 F.Supp. 926 (D.N.J.1960), the district court held that the question of whether a defendant in a civil penalty action under section 5 of the Federal Trade Commission Act had violated the terms of a previous consent order presented triable issues of fact that could be resolved only by jury trial. This case was later criticized, however, by our court in *United States v. Vulcanized Rubber & Plastics Company*, 288 F.2d 257 (3d Cir.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961). *Vulcanized Rubber* involved an appeal from a summary judgment in favor of the United States, awarding $6,000 under section 5(*l*) for violation of a FTC cease and desist order. We affirmed, noting that "[s]ince there was no issue of fact presented, the district court properly disposed of the case on summary judgment." *Id.* at 257–58 n.2. The opinion then went on to reject the holding of the *Hindman* court:

---

4. *Beneficial Corporation* involved a challenge to enforcement of an original consent order. As the district court observed.

 Where, as here, the Commission issued an administrative complaint reflecting its belief that certain practices were deceptive or confusing, and than entered into a consent order which required the respondent to cease and desist from employing those, and similar practices, it is extremely unlikely that the Commission intended to subject itself to a more rigid evidentiary burden.

 *Reader's Digest*, 464 F.Supp. at 1046–47.

5. The Digest also argues that the district court erred by barring discovery of FTC documents which would have revealed the Commission's understanding of the disputed portion of the consent order. We agree with the trial court's ruling that these items were not relevant to its interpretation of the order. *See United States v. Beatrice Foods Co.*, 493 F.2d 1259, 1264 (8th Cir. 1974), *cert. denied*, 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

6. It is curious that the Digest makes this argument after having itself moved for summary judgment on the question of liability.

The holding was erroneous, since the sole issue before the court was whether or not the labeling practice was within the proscription of the order and not whether the labeling practice was deceptive ... [m]oreover, creating an issue of fact as the court did in *Hindman*, would usurp the function exclusively vested in the Federal Trade Commission to determine the issue of whether a labeling practice is misleading or deceptive to the public.

*Id.*[7]

Thus, *Vulcanized Rubber* stands for the proposition that in a section 5(*l*) suit for the recovery of civil penalties, the question of whether a challenged practice lies within the prohibition of a previous consent order is a question of law capable of resolution by the court on a motion for summary judgment. The Digest, however, relies on the Second Circuit's decision in *Williams*, which rejected this court's *Vulcanized Rubber* decision, and concluded that the question of whether advertisements violated an FTC order presented triable issues of fact to be decided by a jury.[8] With all due respect to the Second Circuit's thorough opinion, we will continue to adhere to our holding in *Vulcanized Rubber*, and treat the question of whether a consent order has been violated as a question of law to be decided by the court.

Our affirmation of *Vulcanized Rubber* is based, in part, upon our rejection of the assertion in *Williams* that the question of whether a consent order has been violated is the type of question that has been tradi-

tionally decided by juries. *See* 498 F.2d at 421–30. As Judge Oakes observed,

with only one exception, and that a case subsequently subjected to severe criticism by its own circuit court of appeals [*Hindman*], no case among the many cited in part III of the majority opinion holds that, in an action brought by the United States to recover civil penalties for violation of the valid order of *an administrative agency*, the defendant had a right to a jury trial as a matter of statutory or constitutional law.

*Id.* at 440 (emphasis original). Subsequent cases have not been to the contrary.[9]

Moreover, we believe that our position in *Vulcanized Rubber* is consistent with the overall purpose and structure of the Federal Trade Commission Act—fair and effective regulation of false and deceptive advertising. *See Williams*, 498 F.2d at 441–45 (Oakes, J., dissenting). The interposition of the jury in section 5(*l*) proceedings would cause unwarranted delays in the enforcement of FTC consent orders. "It is most difficult to see appellants' claim for plenary or jury trial as anything more than 'the tactics of delay and procrastination.'" *Id.* at 452 n.27 (citation omitted). The availability of a jury might well embolden companies to disseminate materials close to the borderline of an order's proscription because of a perceived increase in its odds of prevailing at trial. It would also deter the FTC from vigorous enforcement of its orders. *Cf.* 88 Harv.L.Rev. 1035, 1040 (1975).[10] Finally, it would be difficult to

---

7. Although the *Vulcanized Rubber* footnote is usually referred to as dictum, *see e. g., Williams*, 498 F.2d at 422, as Judge Oakes has observed, the district court's award of summary judgment in favor of the Government in *Vulcanized Rubber* was affirmed even though the company characterized the dispute as factual rather than legal. *See Williams*, 498 F.2d at 450–51 (Oakes, J., dissenting).

8. The *Williams* decision is noted and criticized in 88 Harv.L.Rev. 1035 (1975), and 53 Tex.L. Rev. 387 (1975). *See also* Note, *Deceptive Advertising, FTC Fact Finding and the Seventh Amendment*, 43 Fordham L.Rev. 606 (1975).

9. Indeed, in a recent action in the Second Circuit for penalties under section 5(*l*) of the Federal Trade Commission Act, the district court decided on summary judgment the question of whether the defendant had violated a negotiated consent order. *United States v. Olin Ski Co., Inc.*, 503 F.Supp. 141 (S.D.N.Y.1980). *See also United States v. Bestline Products Corp.*, 412 F.Supp. 754 (N.D.Cal.1976). *But see United States v. Golden Fifty Pharmaceutical Co., Inc.*, 421 F.Supp. 1199 (N.D.Ill.1976).

10. *See also* Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 Harv.L.Rev. 661, 692–93 (1977) (emphasizing the limited resources available to FTC for

prevent the jury from deciding *de novo* the underlying question of deceptiveness, rather than comparing the challenged practice with the consent order's prohibition. *Williams*, 498 F.2d at 440–41 n.4 (Oakes, J., dissenting).[11]

We hold, therefore, as the district court did below, that the question of whether the travel check and cash-convertible bond violated the terms of the consent order was a question of law capable of decision on a motion for summary judgment. We must now decide whether the district court determined correctly that both of these items fell within the order's proscription.

The challenged travel check is reprinted in appendix 2 of this opinion. The district court held that in order to be a confusingly simulated item of value violative of the order, the travel check must have had "a capacity to confuse or mislead consumers comparable to that of the 'check' included in the administrative complaint [reprinted in appendix 1 of this opinion]." *Reader's Digest*, 464 F.Supp. at 1053. We believe that this standard is consistent with the consent order's principal purpose of preventing the Digest from inducing consumers to participate in sweepstakes by means of items that appear to be valuable, but in fact are not. The court then compared the travel check to the original check, and con-

cluded that: "[s]everal striking similarities between the Travel Check and the original check make the conclusion that the former is confusingly simulated almost inescapable." *Id.* Our examination of the travel check compels the same conclusion: the travel check is the type of document that falls clearly within the order's prohibition. It is the type of document that appears to be valuable but in fact is not.[12]

The cash-convertible bond is reprinted in appendix 3 of this opinion. Engaging in the same analysis with respect to the bond as it did with the travel check, the district court found it also to be a confusingly simulated item of value. Once again, our examination of the document compels the same conclusion. The consent order barred the Digest from disseminating items which appeared to be valuable, but were not. The bond falls within this prohibition, and accordingly, the district court's finding of liability will be affirmed.

### B. Commercial Speech

The Digest next contends that the district court's construction of the consent order as not requiring evidence of actual deception violated its constitutional right to advertise. Appellant's argument is based upon a line of recent Supreme Court cases extending the protection of the first amendment to commercial speech.[13] But

the investigation of deceptive advertising practices).

11. Presumably, this was the concern expressed by the *Vulcanized Rubber* court when it stated that "creating an issue of fact as the court did in *Hindman*, would usurp the function exclusively vested by Congress in the Federal Trade Commission to determine the issue of whether a labeling practice is misleading or deceptive to the public." *Vulcanized Rubber*, 288 F.2d at 258 ·59 n.2.

12. The Digest argues that the district court erred by holding that the company's efforts to conform the travel check to the requirements of the consent order were irrelevant. But as the Supreme Court stated in *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 393, 85 S.Ct. 1035, 1047, 13 L.Ed.2d 904 (1965):

If respondents . . . attempt to come as close to the line of misrepresentation as the

Commission's order permits, they may without specifically intending to do so cross into the area proscribed by this order. However, it does not seem 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.' *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 [72 S.Ct. 329, 331, 96 L.Ed. 367].

13. *See, e. g., Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). ·

while it is now established beyond dispute that commercial speech comes within the protection of the first amendment,[14] it is equally clear that commercial speech is subject to "modes of regulation that might be impermissible in the realm of non-commercial expression." *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). The Government "does not lose its power to regulate commercial activity deemed harmful to the public wherever speech is a component of that activity." *Id.* Thus, in evaluating the consent order at issue here, the district court undertook "the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation." *Reader's Digest*, 464 F.Supp. at 1051, *quoting, Bigelow v. Virginia*, 421 U.S. 809, 826, 95 S.Ct. 2222, 2235, 44 L.Ed.2d 600 (1975). Striking this balance, the court concluded that the consent order "passe[d] constitutional muster without a requirement of proof of deception." *Reader's Digest*, 464 F.Supp. at 1052. We agree.

 As the Second Circuit recently noted in *Jay Norris, Inc., v. FTC*, 598 F.2d 1244, 1252 (2nd Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 481, 62 L.Ed.2d 406 (1980), "[t]he FTC is charged by Congress with the duty of protecting consumers from the deceptive and misleading use of commercial speech or advertising." Commensurate with this duty is the power to fashion broad remedial relief to prevent a company engaging in deceptive practices from engaging in similarly deceptive practices in the future. *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 392, 79 S.Ct. 818, 824, 3 L.Ed.2d 893 (1959); *National Commission on Egg Nutrition v. FTC*, 570 F.2d 157, 164 (7th Cir. 1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978). Any remedy formulated by the FTC that is *reasonably necessary* to the prevention of future violations does not impinge upon constitutionally protected commercial speech. *Jay Norris*, 598 F.2d at 1252; *Beneficial Corporation*, 542

F.2d at 619. *See also* Reich, *Consumer Protection and the First Amendment: A Dilemma for the FTC?*, 61 Minn.L.Rev. 705, 718 (1977) (arguing that the inclusion of commercial speech within the first amendment does not mean that the FTC "can no longer shape remedial relief to 'fence in' violators and proscribe deception and unfairness in all its various forms."); *Pitofsky, supra* note 10, at 671–73 (asserting that first amendment will not serve as shield against FTC enforcement actions for deceptive advertising).

Within this framework for analysis, it is apparent that the district court properly concluded that the consent order did not require evidence of actual deception. As the court observed, "[g]iven the incontestable premise that the simulated check included in the administrative complaint is deceptive, the Government's presumption that all similarly situated items of value probably will be deceptive is not unreasonable." *Reader's Digest*, 464 F.Supp. at 1052. The effectiveness of the FTC's efforts to prevent the dissemination of confusingly simulated items of value would be "substantially diminished" if it were required to prove actual deception. *See Ohralik*, 436 U.S. at 466, 98 S.Ct. at 1924. These governmental interests do, as the district court found, substantially outweigh the value of the affected commercial speech. *Reader's Digest*, 464 F.Supp. at 1052. Accordingly, we hold that there has been no violation of the Digest's first amendment rights.

### C. The Penalty

The Digest challenges the district court's assessment of a $1,750,000 penalty for its violation of the consent order. The company's first assertion is that the trial court erroneously determined the number of violations of the order. It argues that each bulk mailing, and not, as the district court concluded, "each individual distribution of a Travel Check or Cash Convertible Bond," constituted a separate violation of the order. *Reader's Digest*, 494 F.Supp. at 774.

---

14. *See generally*, Comment, *First Amendment Protection for Commercial Advertising: the*

*New Constitutional Doctrine*, 44 U.Chi.L.Rev. 205 (1976).

The Digest also maintains that the district court's calculation of the $1,750,000 penalty was based upon an improper analysis of the factors set forth by this court *Papercraft,* 540 F.2d at 141. For the reasons given below, we disagree.

■ In determining the number of violations of the consent order, we must examine the applicable provisions of the statute, and the order itself. The statute, 15 U.S.C. § 45(*l*) (1976) provides, in pertinent part, that a violator of a FTC cease and desist order "shall forfeit and pay to the United States a civil penalty of not more than $10,000 for *each* violation." (emphasis added). The statute further provides that "[e]ach separate violation of such an order shall be a separate offense." *Id.* Turning to the applicable terms of the consent order, the Digest was prohibited from "[u]sing or distributing simulated checks, currency, 'new car certificates;' or using or distributing *any* confusingly simulated item of value." Appendix at 38a (emphasis added). Juxtaposing the language of the statute and the order, we reach the same conclusion as the district court—the distribution of *any* simulated item of value comprised a separate violation of the order. Thus, each mailing of an individual travel check or cash convertible bond constituted a distinct violation of the consent order, punishable by a penalty not to exceed $10,000.

The question of whether bulk mailings constitute single or multiple violations of a consent order is one of first impression for a circuit court. We nonetheless find strong support for our holding in several district court decisions. In *United States v. Floersheim,* [1980–2] CCH Trade Cases ¶ 63,368 (C.D.Cal.1980), *aff'd,* 659 F.2d 1090 (9th Cir. 1981) the Government sought civil penalties for violations of a consent order prohibiting the sale of misleading and deceptive business forms. The court found that sale of approximately 300,000 copies of the forms constituted 300,000 violations of the order because "[e]ach individual form sold constituted a separate violation of the order and

is therefore a separate offense subject to penalties." *Id.*

In *Golden Fifty Pharmaceutical Co.,* the Government sought penalties for fourteen mass mailings and two individual mailings which, defendants admitted, violated a FTC consent order. The district court concluded that not only had there been sixteen violations, but that each individual mailing could have been construed to have been a separate violation of the order prohibiting the company from mailing "*any advertisement* which contain[ed] a proscribed representation." 421 F.Supp. at 1207 (emphasis original). The court reasoned that "[i]f defendant had mailed a single advertisement in Court I, we would have little trouble finding a violation. The fact that they mailed millions, rather than one or two, as in Court III, does not diminish the seriousness of each individual violation." *Id. See also Williams,* 354 F.Supp. 521, 547–48 (S.D.N.Y. 1973), *aff'd in part and rev'd in part,* 498 F.2d 414 (2d Cir. 1974) (broadcast of eleven offending commercials on 100 separate television programs held to constitute 100 violations of the order); *United States v. Wilson Chemical Company, Inc.,* 1962 CCH Trade Cases ¶ 70,478 (W.D.Pa.1962), *aff'd,* 319 F.2d 133 (3d Cir. 1963) (offending advertisement appeared in 25,000,000 comic books; although government grouped the violations into nine categories depending upon publisher and date of publication, "in reality each comic book published and mailed which reaches the hands of a recipient is a violation of the Order.")

Our holding that each letter included as part of a mass mailing constitutes a separate violation is also predicated upon our belief that it is consistent with the legislative purpose underlying the penalty provision of the statute, 15 U.S.C. § 45(*l*) (1976). As the Supreme Court held in *ITT Continental Baking,* "Congress was concerned with avoiding a situation in which the statutory penalty would be regarded by potential violators of FTC orders as nothing more than an acceptable cost of violation, rather than as a deterrence to violation." 420 U.S.

at 231, 95 S.Ct. at 932.[15] *See also Brown & Williamson Tobacco Corp. v. Engman*, 527 U.S. 1115, 1120 (2d Cir. 1975), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). Adopting the Digest's position that one bulk mailing—no matter how large—comprises only one violation would eviscerate any punitive or deterrent effect of FTC penalty proceedings.[16]

We also reject the Digest's contention that "logic" dictates that it could not have committed so many violations as to have exposed it to a potential penalty amounting to billions of dollars. Although our holding with respect to the number of violations does give rise to the possibility of enormous potential liability, any penalty actually imposed by a district court would be subject to the limitation of judicial discretion. *Brown & Williamson*, 527 F.2d at 1121; *ITT Continental Baking*, 420 U.S. at 229 n.6, 95 S.Ct. at 930–31 n.6.[17] Indeed, while we do not trivialize the gravity of a $1,750,000 penalty, it is apparent that the district court exercised its discretion in the instant case. Whether or not the court abused its discretion is the question that we turn to next.

In determining the size of the penalty to be assessed against the Digest, the district court, relying on our *Papercraft* decision,[18] took five factors into consideration: (1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendant's ability to pay; (4) the desire to eliminate the benefits derived by a violation; and (5) the necessity of vindicating the authority of the FTC. *Reader's Digest*, 494 F.Supp. at 772. The Digest does not challenge the district court's reliance on these factors; rather, it asserts that the court evaluated three of the factors improperly: good faith; public injury; and benefits derived by a violation. We will review each of these contentions below.

■ The record clearly supports the district court's conclusion that the Digest did not act in good faith when it disseminated the travel checks and cash-convertible bonds. Although the FTC informed the Digest as early as April 13, 1973, that it considered the travel checks to be violative of the consent order, the Digest nonetheless proceeded to complete its promotional campaign by mailing millions of additional travel checks between April 13, and June 30, 1973. *See* Appendix at 728–29a; 627–29a. The Digest now maintains that these additional mailings simply reflected the lag time required by the logistics of bulk mailing. We reject this argument, and agree with the district court's conclusion that the course of conduct engaged in by the Digest between April 13, and June 30, 1973 "[did] not reflect a good faith effort to comply

---

**15.** Although *ITT Continental Baking* dealt with the continuing violation provision of 15 U.S.C. § 45(*l*) (1976), we believe that the Court's holding applies with equal force to a civil penalty action for separate violations under the statute. We find nothing to the contrary in the legislative history cited by the Digest.

**16.** *Cf.* Diver, *The Assessment and Mitigation of Civil Money Penalties by Federal Administrative Agencies*, 79 Colum.L.Rev. 1435, 1458 (1979): "[t]he efficacy of any regulatory program depends on the sanctions imposed in individual cases. If these sanctions are set too low, potential violators may be insufficiently motivated to minimize the social harm resulting from their behavior, or society may be under compensated for the harm that does occur."

**17.** As the Second Circuit observed in *Brown & Williamson*, the legislative history of the 1950 Amendment to 15 U.S.C. § 45(*l*) contemplated the exercise of judicial discretion in meting out penalties for violations of consent orders:

> [I]t is inconceivable to me that any Federal court would impose penalties under this section which are not reasonably related both to the seriousness of the offense charged and the size and resources of the defendant. 96 Cong.Rec. 2974, 3026 (1950) (letter from W. T. Kelley, General Counsel, FTC, to Senator Fulbright).
> In no event would the court sanction any unreasonable penalty, or any such total penalty as would be destructive of legitimate business. So, therefore, I do not think there is any real danger here to legitimate business. 96 Cong.Rec. 3019 (1950) (remarks of Senator George).

527 F.2d at 1121 n.8.

**18.** *Papercraft*, in turn, drew upon Judge Friendly's analysis in *Williams*. *See* 498 F.2d at 438–39.

with the order." *Reader's Digest*, 494 F.Supp. at 775.[19]

Further evidence of bad faith is supplied by the Digest's failure to avail itself of the mechanism for obtaining an opinion from the FTC prior to distributing the travel checks and cash-convertible bonds. The applicable FTC rule in 1973 provided, in pertinent part: "[a]ny respondent subject to a Commission order may request advice from the Commission as to whether a proposed course of action, if pursued by it, will constitute compliance with such order." 16 C.F.R. § 3.61(d) (1973). This provision has been interpreted by the Supreme Court as obligating the FTC to "give . . . definitive advice as to whether [a] proposed action, if pursued, would constitute compliance with the order." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394, 85 S.Ct. 1035, 1048, 13 L.Ed.2d 904 (1965).[20] That the Digest neglected to seek an opinion from the FTC is particularly surprising in light of its awareness that the consent order called for "careful scrutiny of any 'bonds,' 'traveler's checks' or other copies of negotiable instruments." Appendix at 751a (memorandum to the Digest's employees from Blatch con-

cerning the scope of the consent order). We also find, contrary to the Digest's assertions, that its procedure for clearing all promotional copy with in-house counsel does not prove good faith in view of its failure to utilize the appropriate administrative mechanism for obtaining FTC advice.

 Finally, with respect to its good faith argument, the Digest contends that the district court committed prejudicial error by admitting into evidence a promotional packet mailed to a Miss Megan R. Golden in 1979, which apparently could be considered to be a confusingly simulated item of value. *See Reader's Digest*, 494 F.Supp. at 777. While we are inclined to agree with the Digest that this document was of little probative value to a determination of the company's good faith in disseminating travel checks and cash-convertible bonds in 1973–74, we nonetheless do not find any prejudice arising from its consideration by the district court. The trial court found the mailing to be only one indicia of the Digest's lack of good faith; there is abundant additional evidence to support its conclusion.

---

19. The Digest maintains that after its meeting on May 2, 1973 with the FTC, it believed that discontinuance of the travel check campaign by June 30, 1973 would satisfy the Commission's concerns. However, the cross-examination of Mari Ann Blatch, the Digest's then associate general counsel, revealed that the FTC never implicitly or explicitly approved the continued mailing of the travel checks after May 2, 1973:

Q: Did any member of the FTC, Mr. Ryder or Mr. Sanger or anyone else, ever approve or authorize the continued mailing of the travel check at the May 2 meeting or at any time thereafter?

A: No, and I didn't ask them to because I had said we would discontinue, which we did. On any number of occasions after that I did ask how we were doing, did they have any other suggestions, were there any other matters still open or any reason why we weren't receiving our report, and that is why I received for example, the letter saying "No cause for concern."

Q: I appreciate your elaboration, but in fact there was never any letter communication, written communication, oral communication, authorizing the continued use of the travel check?

A: No.

Appendix at 625–26a.

20. The Digest argues that *Colgate-Palmolive* is inapposite because the regulation construed by the Court in that case was subsequently amended to provide, as it did in 1973, that "[a] request ordinarily will be considered inappropriate for such advice . . . (2) where the same or substantially the same course of action is under investigation or is or has been the subject of current proceedings, order, or decree initiated or obtained by the Commission or another governmental agency." 16 C.F.R. § 3.61(d) (1973). The Digest appears to be contending that this amendment of the FTC rules relieved it from the duty of seeking advice from the Commission prior to distributing the travel checks and cash-convertible bonds. But, in fact, the Digest cannot be arguing this, because it would be tantamount to admitting that these promotional campaigns constituted "the same or substantially the same course of action [that] has been the subject of a current . . . order." *Id.* Moreover, the Digest's construction of § 3.61(d) would render it meaningless. Thus, the Digest should have requested a prior opinion from the FTC.

The FTC rule is currently codified as 16 C.F.R. § 2.41(d) (1980).

Turning to the the second factor at issue, public injury, the Digest asserts that the record is devoid of evidence of consumer confusion or deception. But this argument fails for the same reason that it did with respect to the construction of the consent order—proof of actual confusion or deception is not required. *See* pp. 962–964 *supra.* As the district court observed, "[t]he principal purpose of a cease and desist order is to prevent material having a capacity to confuse or deceive from reaching the public ... [t]hus, whenever such promotional items reach the public, that *in and of itself* causes harm and injury." *Reader's Digest,* 494 F.Supp. at 777–78 (emphasis original). The trial court had already determined that the travel check and cash-convertible bond possessed the capacity to deceive; accordingly, the Government was not obligated to adduce evidence of specific injuries to consumers.

Finally, with respect to the benefits derived by the violation, the district court concluded that the Digest received "substantial benefits from the violative distributions." *Id.* at 778. We find ample support for the court's conclusion. The district court found that the Digest obtained more than $5,000,000 in gross subscription revenues from the travel check and cash-convertible bond promotions. The travel check campaign ranked among the top three of all the company's promotions. Thus, the district court properly rejected the Digest's contention that it received no particular benefit from the violative mailings.

In sum, we conclude that the district court carefully considered the relevant factors prior to assessing the $1,750,000 penalty upon the Digest. We hold that there was no abuse of discretion by the district court.

## D. The Injunction

In addition to assessing a monetary penalty upon the Digest, the district court entered an injunction which stated:

Defendant Reader's Digest Association, Inc., its officers, directors, servants, employees, agents, representatives, assigns, and all persons in active concert or participation with defendant, who shall have received actual notice of the contents of this Final Judgment and Permanent Injunction, by personal service or otherwise, directly or through any corporate or other device, are hereby permanently enjoined in connection with the publication, advertising, offering for sale, sale, or distribution of magazines, books, or other products in commerce as 'commerce' is defined in the Federal Trade Commission Act from: '[u]sing or distributing simulated checks, currency, "new car certificates"; or using or distributing any confusingly simulated item of value.'

Appendix at 826a.

The Digest asserts that: the injunction is impermissibly vague; the district court did not set forth the reasons for its issuance; the injunction is unsupported by evidence in the record; and, the injunction purports to restrict the conduct of persons beyond the jurisdiction of the court. We find these contentions to be without merit.

The form and scope of injunctions is mandated by Fed.R.Civ.P. 65(d) which provides, in part, that an injunctive order "shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts to be restrained." These prerequisites to the issuance of an injunction "are designed to protect those who are enjoined by informing them of what they are called upon to do or refrain from doing in order to comply with the injunction." 11 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2955 at 536 (1973). The Digest can hardly argue that, after the termination of this litigation, it will not be on notice as to what type of activity is proscribed by the injunction. The district court, and now this court, have both construed the portion of the consent order included within the injunction. The injunc-

tion may be broad, but it is not vague;[21] it states with sufficient specificity what practices are prohibited.[22]

Rule 65(d) also provides that an injunction "shall set forth the reasons for its issuance." This provision refers to the order or opinion granting the relief, and the reasons need not be set forth within the injunction itself. *Hunter v. United States*, 388 F.2d 148, 155 n.6 (9th Cir. 1967). The district court stated that it decided to grant the injunctive relief because it was "convinced that this additional remedy should be afforded the Government in order to further assure that Reader's Digest will abide by the provisions of the order to which it agreed in 1971." *Reader's Digest*, 494 F.Supp. at 779. This statement, when read in the context of the court's entire opinion detailing the Digest's lack of good faith in prior compliance with the consent order, provides a sufficient reason for the issuance of the injunction. *Cf. United States v. Rohm & Haas Company*, 500 F.2d 167, 177 (5th Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1352, 43 L.Ed.2d 439 (1975).

We also conclude that the district court's opinion provides sufficient findings to support its decision to afford injunctive relief. The court's opinion reveals that it grounded its decision to grant the injunction upon its determination that the Digest acted in bad faith. There is ample evidence in the record to support the court's conclusion that the Digest cannot be reasonably expected to comply with the consent order in the future without a judicially imposed prohibition.

Finally, we reject the Digest's contention that the injunction purports to be binding upon persons beyond the Court's jurisdiction. The language of the order, enjoining the Digest and its "officers, directors, servants, employees, agents, representatives, [and] assigns" who have notice, merely tracks the language provided by Rule 65(d).[23] *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2956 at 566–68 (1973). Accordingly, we hold that the district court did not abuse its discretion by granting the Government's request for injunctive relief.

### III

In conclusion, we hold that the district court properly granted the Government's motion for summary judgment on the issue of liability. The district court's finding that the travel checks and cash-convertible bonds violated the consent order did not impinge upon the Digest's constitutionally protected commercial speech. We find that the district court concluded correctly that each individual mailing constituted a separate violation of the consent order, and that the court did not abuse its discretion by assessing a penalty of $1,750,000 upon the Digest. Finally, we hold that the district court did not abuse its discretion by enjoining the Digest from future violations of the consent order.

Therefore, the judgment of the district court will be affirmed.

---

21. "Broadness refers to the range of the defendant's activity brought within the purview of the decree; vagueness refers to the particularity with which this range of activity is described." *Developments in the Law—Injunctions*, 78 Harv.L.Rev. 994, 1064 (1965). *See also* Jaffe, *The Judicial Enforcement of Administrative Orders*, 76 Harv.L.Rev. 865, 885–86 (1963).

22. This is not a case, like *United States v. Vitasafe Corp.*, 345 F.2d 864, 871 (3d Cir.) *cert. denied*, 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 (1965), in which the defendant is placed " 'at the peril of a summons for contempt' without providing any guidelines for the carrying on of a future advertising program in a manner

deemed appropriate by the District Court." Not only is the injunction at issue in the instant case sufficiently specific, but the Digest may also resort to the FTC's administrative procedure for obtaining advisory opinions prior to embarking upon future advertising campaigns. *See* p. 970 & note 20 *supra*.

23. Fed.R.Civ.P. 65(d) provides, in relevant part, that "[e]very order granting an injunction . . . is binding upon the parties to the action, their officers, agents, servants, employees, and attorneys . . . who receive actual notice."

APPENDIX 1

GB939-3

NON-TRANSFERABLE

**READER'S DIGEST $250,000.00 SWEEPSTAKES**

If you are an Early Bird Prize winner—Reader's Digest guarantees to deposit each month in your personal account the below-mentioned sum at your local _____ bank (or any other bank you may designate).

NO XC 529073

Pay the sum of **ONE HUNDRED DOLLARS A MONTH FOR LIFE**

$100.00/100

You have been selected to receive 2☐ 3☐ 4☐ 5☐ 6☒ 7☐ Lucky Numbers. See next page.

This check is not negotiable. But if you return it by May 22, 1969, and one of your Lucky Numbers is the early bird prize winner . . . you will receive the sum above each month for the rest of your life. Mail back this entire Sweepstakes Book today. SEND NO MONEY.

Carolyn Davis

SAMPLE

VALID ONLY IF RETURNED BEFORE MAY 22 13

APPENDIX 2

"TRAVEL CHECK"

» 100 DOLLARS A MONTH FOR LIFE «

WILL BE
PAID TO THE
ORDER OF:

Mr. George R. Surrette
62 Nanel Dr.
Glastonbury, Conn. 06033

This "Travel Check" is not negotiable, but if you return this entire "Sweepstakes PASSPORT" by August 3, 1973, and if any one of your six numbers should be the Grand Prize winner . . you will receive the sum above each month for the rest of your life.

YOUR
SWEEPSTAKES
NUMBERS

A 109 021
B 210 032
C 311 144

M1071-11

APPENDIX 3

SLOVITER, Circuit Judge, concurring.

I agree with the majority's disposition of this case and almost all of its comprehensive opinion. I write separately only because I believe that the discussion of the division between judge and jury at pp. 963–964 goes further than necessary under the facts of this case. The case before us is one in which the issues were clearly appropriate for disposition by the trial court, because Reader's Digest did not request a jury trial. However one characterizes the issue of whether Reader's Digest's conduct was proscribed by the prior consent order, it is clear that in this case, it was the trial court which would have been required to make that decision. Therefore the only question before us on that issue is whether summary judgment was appropriate. Because the relevant facts were not in dispute, I agree with the majority that summary judgment was appropriate.

I would leave for another day the issue whether the dictum in the footnote in *United States v. Vulcanized Rubber & Plastics Co.*, 288 F.2d 257, 258 n.2 (3d Cir.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961), precludes a jury trial in all instances on a respondent's claim that its actions were not proscribed by a prior order.

## SUR PETITION FOR REHEARING

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.

### JAMES HUNTER, III, Circuit Judge.

The petition for rehearing filed by appellant in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

Judges Aldisert, Adams and Weis would grant the petition for rehearing in banc.

## STATEMENT BY JUDGE ADAMS

Judge Adams votes for rehearing because he believes the imposition of a penalty, in the context here, based on the number of individual documents (simulated travel checks and bonds) mailed to the public is inconsistent with the governing statute, which provides for a "penalty of not more than $10,000 for each *violation.*" The sole support for the holding on this point is dicta from three district court opinions. The only court of appeals opinion which addresses the subject, *U. S. A. v. J. B. Williams*, 498 F.2d 414 (2d Cir. 1974), would appear to point in the other direction. Further, it is at least questionable that Congress would authorize a penalty of up to $10,000 for each piece of mail that is sent. If the rationale of the opinion in this case were to be applied to newspapers, for example, it could result in penalties of millions of dollars for a single press run. In the absence of clear language sanctioning a result of this kind, I would be reluctant to attribute such an intent to Congress.

Judges ALDISERT and WEIS join Judge ADAMS' statement.