[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 22, 2007
THOMAS K. KAHN
CLERK

————————————

No. 07-10273

————————————

D. C. Docket No. 02-00917-CV-JOF-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD L. PROCHNOW,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————

**(October 22, 2007)**

Before EDMONDSON, CARNES and FAY, Circuit Judges.

PER CURIAM:

This is Richard L. Prochnow's appeal from the judgment of the district court assessing civil penalties against him and ordering disgorgement of profits because of his violation of the Federal Trade Commission's Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310, and of the terms of a consent decree entered into by him and the FTC in 1996. For the reasons set forth below, we affirm.

## I.

In 1995 Prochnow founded Direct Sales, Inc., which was the general and controlling partner of Prochnow's telemarketing company, Direct Sales International, LP (DSI). DSI contracted with "lead broker" organizations—groups who solicited orders from consumers for magazine package subscriptions. After the lead broker made an initial sale, it would refer the sale to DSI, and a DSI employee would call the customer to verify the order. DSI employees used standardized scripts to make the verification calls. If a DSI employee was able to verify the lead broker's sale, it would place a corresponding order with the publisher of the magazine.

In December of 1996 Prochnow entered into a consent decree with the Federal Trade Commission, the purpose of which was to stop some of Prochnow's telemarketing practices. Included in the consent decree was a provision prohibiting Prochnow and his agents from:

(g) Making any reference or statement concerning "a few dollars per week," "60 months," or any other statement as to a sum of money or duration or period of time in connection with a subscription contract or other purchase agreement which does not in fact provide, at the option of the purchaser, for the payment of the stated sum, at the stated interval, and over the stated duration or period of time; . . .

(h) Failing, in the case of PDS [Paid During Service] Plan sales, to clearly reveal orally prior to the time the subscription contract is agreed to by the customer and in writing on the subscription order form and the sales agreement (or separate schedule), with such conspicuousness and clarity as will likely to be read by the purchaser, the following terms of the subscription order:

    . . . .

    (ii) The total cost of each publication and all the publications covered by the contract.

In other words, the consent decree forbade Prochnow and his agents from quoting to customers the per-week cost of a magazine package unless the customers were allowed to pay for the packages on a weekly basis, and it required Prochnow and his agents to inform customers of the cost of each individual magazine and the overall cost of the magazine package.

Through scripts provided by Prochnow's representatives, the FTC learned that his agents were still quoting weekly rates to customers during sales verification calls. The FTC cautioned Prochnow that he needed to clarify to customers that they could not make weekly payments to purchase the magazine packages. However, in early 1997 Prochnow's agents began quoting the price of

the magazine packages as follows: (1) they would quote a weekly rate (total cost of the package divided by the number of weeks the customer would receive the package); (2) they would add the total cost per week for all magazines to be distributed during the customer's subscription; (3) they would divide that number by twelve; and (4) they would make that figure the amount of the customer's monthly payment. Then, when quoting the package's total cost, they would use the term "total value" and would inform customers that the package represented a steep discount off of the newsstand price. The upshot is that after entering the consent decree in 1996, Prochnow's agents were still quoting weekly prices and using the term "total value," which was misleading because customers did not understand "total value" to be the same as their "total cost." During 1998 and 1999, Prochnow's agents persisted in failing to advise customers of the price of individual magazines and continued to refer to the total price as the "total value."

Prochnow's customers were told that DSI needed to be able to rely on the customer's word and be assured that the customer would fulfill his obligations under the agreement because Prochnow had to prepay publishers for the costs of the magazine. This was not true in most cases, and in any event, Prochnow's typical purchase price from the publisher was about 10 to 20 percent of what the customers paid, and even that amount was paid not in advance but instead during

4

the course of the customer's purchase period. In addition, Prochnow paid nothing for some magazines, which were termed "zero remit" subscriptions.

In 1998 Prochnow, through his agents, began selling memberships in a "buying service" at the end of subscription verification calls. Supposedly, the service would allow members to buy other goods and services at discount prices. As part of the sales pitch for the service, the verifier would offer the customer a 30-day, "no obligation" membership in the club. The customer was told that the cost of the service after the 30-day trial would be a monthly fee billed to their credit card. Prochnow's verifiers did not tell the customer, however, that enrollment would be automatic unless they called the buying service to cancel their membership during the initial 30-day period, and that their credit card would be charged for an entire year's membership as soon as the trial period expired. Nor did the verifiers provide the customers with the buying service's telephone number.

Prochnow initially made some attempts to comply with the consent decree. In 1996 and early 1997, he hired an attorney to consult the FTC about the language of the scripts used by the lead brokers and by the verifiers. Also, he had several attorneys conduct compliance training meetings with lead brokers to inform them of what was necessary to comply with the consent decree and with

the TSR. However, any resolve to comply with the consent decree and the TSR faded in 1997 and was non-existent during 1998 and 1999.

The district court's findings of fact illustrate the deceptive nature of Prochnow's business practices. On average, only 60 percent of the sales passed to DSI by a lead broker were actually verified. And the typical verification call was made by a DSI employee who talked too fast to be understood by a person of average intelligence. Not surprisingly, about 70 percent of the sales that were verified by DSI were either cancelled or went into collection between the second and third months after verification. From 1996 to 1999, the Better Business Bureau of Atlanta received an average of one complaint a day relating to DSI, and Prochnow knew of those complaints. Except for customers who had contacted a government authority, anyone who attempted to cancel his account was greeted with new sales pitches.

The United States filed the complaint in this case against Prochnow in April 2002 seeking civil penalties, equitable monetary relief, and a permanent injunction for violations of the TSR and the 1996 consent decree. In addition to the consent decree violations we have already discussed, the district court found that Prochnow's employees violated the TSR by: (1) telling consumers that the company pre-paid publishers for the magazines, which was not always the case;

(2) failing to inform consumers that their credit cards would be billed for the buying club memberships unless the consumer called within thirty days to cancel the membership; (3) failing to provide information that would have permitted consumers to make those calls; (4) advising consumers of a weekly cost for the magazine packages, although there was no weekly payment plan; and (5) failing to inform consumers of the total cost of the package they were ordering.

After finding that Prochnow had violated the consent decree and the TSR, the court assessed civil penalties against Prochnow in the amount of $5,455,280, and it ordered disgorgement of illegal profits in the amount of $1,685,000.

## II.

On appeal Prochnow raises four issues, contending that the district court erred in finding that he, through DSI, had violated the consent decree; in determining the amount of his civil penalty; and in determining the amount of disgorgement. He also contends that the district court's civil penalty and disgorgement order violated his Eighth Amendment rights. We address each contention in turn.

## A.

Prochnow argues that the district court incorrectly found that DSI's scripts had misled consumers and breached the consent decree provisions regarding the

7

quoting of weekly rates, statement of total costs, and upselling. The district court's order lays out in detail the specific violations of the consent decree and explains the nature and duration of those violations. The evidence underlying those findings is overwhelming, and the court committed no errors of law in reaching them. We reject Prochnow's argument that the violations were not really violations or at best were merely technical violations.

## B.

As for Prochnow's attack on the amount of the civil penalty the district court assessed, we review the underlying factfindings resulting in that assessment only for clear error. Fed. R. Civ. P. 52(a). "Clear error is a highly deferential standard of review." Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1350 (11th Cir. 2005). We review the district court's application of those facts to the law for an abuse of discretion. United States v. Nat'l Fin. Servs., Inc., 98 F.3d 131, 140 (4th Cir. 1996); United States v. Reader's Digest Ass'n, 662 F.2d 955, 967–69 (3d Cir. 1981).

The Federal Trade Commission Act authorizes district courts to award civil penalties and to grant injunctions and other equitable relief where an FTC order or consent decree has been violated. 15 U.S.C. § 45(*l*). In determining the amount of a civil penalty, the district court considers: "(1) the good or bad faith of the

8

defendants; (2) the injury to the public; (3) the defendants' ability to pay; (4) the desire to eliminate the benefits derived by the violations; and (5) the necessity of vindicating the authority of the FTC." United States v. Danube Carpet Mills, Inc., 737 F.2d 988, 993 (11th Cir. 1984) (quoting Reader's Digest Ass'n, 662 F.2d at 967 & n.18). In addition, 15 U.S.C. § 45(m)(1)(A) provides that a district court may impose civil penalties for violations of the TSR, if the government establishes that the defendant violated that rule with either actual or implied knowledge.

The district court found that Prochnow, through his agents, had violated the consent decree and the TSR by making prohibited weekly cost declarations and by failing to adequately disclose the total price of the magazine package. Based on the evidence, including that submitted during a nine-day hearing, the district court found that Prochnow had violated the TSR because he knew that DSI employees were making prepayment misrepresentations to induce customers to buy the magazine packages. The court credited Prochnow's testimony that he did not personally know that DSI verifiers were not disclosing all necessary information during the buying-service "upsells," but it nevertheless found that he was controlling DSI's operations and therefore should have known that illegal upsells were occurring. Consequently, the court imputed knowledge of the upsells to Prochnow.

9

After laying out the nature of the violations it found, the court set forth its findings on their duration. The court acknowledged that some violations had occurred in 1997 but disregarded those because it wanted to credit Prochnow for his efforts at compliance during that year. Therefore, it set January 1, 1998 through December 31, 1999 as the relevant time period for calculating the civil penalty for the violations of the consent decree and TSR.

The district court then considered the injury to the public, which was two-fold. The court found that over half of the purchases were cancelled between two and three months after verification and that most of those cancellations occurred because customers were upset about the price of their subscriptions. The court determined that the customers were harmed by both the payments made for the magazine packages and the frustration, inconvenience, and expense involved in cancelling their subscriptions. The court rejected Prochnow's argument that the customers had simply experienced buyer's remorse, and instead found that the cancellations were the result of DSI's misleading sales tactics. When customers called to cancel, they had either been met with a "save the sell" technique or with an outright refusal to cancel.

The court then determined that each customer who had cancelled had suffered an injury in the approximate amount of $20 for having to endure

interruptions, and in some cases, extra expenses to cancel their subscriptions.
The court noted that the $20 amount "actually under-compensate[d] the public
injury." The court did not include in the damage calculations any amount for
those who had initially purchased a magazine package but never had that purchase
verified by DSI. The number of customers who were injured was calculated based
on data obtained from DSI itself.[1] We will not set out the court's complicated
calculations in detail, because the parties are familiar with them.

Suffice it to say that at several points in its calculations the district court
made assumptions more favorable to Prochnow than the evidence required, and we
are not convinced the court clearly erred in any of its calculations. Under 15
U.S.C. § 45(m)(1)(C) penalties are to be calculated based on the number of days
(not transactions) in which a violation occurs, and § 45(m)(1)(A) allows a civil
penalty of up to $10,000 per violation (day of violation). The district court's final
civil penalty number, as it pointed out, translates to only $7,472 per day of

---

[1] In connection with this issue and also the issue involving the amount of disgorgement,
Prochnow argues that the district court abused its discretion in using Defendant's Exhibit No.
352 to determine verification and cancellation rates, which in turn were used to approximate the
number of injured customers. We disagree that this document, which Prochnow himself put into
evidence, was not admissible for the purpose the court used it. It is a record that was compiled
for and kept in the regular course of Prochnow's business. See Fed. R. Evid. 803(6). Despite
Prochnow's insistence that the author of the document is unknown and his dramatic references to
"the mysterious Cheryl" having prepared it, the author is identified on one of the pages of that
same exhibit as Cheryl Brown, the director of DSI's verification department.

11

violation—considerably less than the maximum that the statute allows. Prochnow attacks some of the details of the district court's calculations, but we will not fault the court for having quantified its analysis far more than it was required to do. The court could have omitted much of the calculation from its analysis and reached the same, or even a higher, civil penalty assessment based on more general estimations and approximations.

## C.

As for Prochnow's attack on the amount of the disgorgement that was ordered, we review that finding only for clear error. SEC v. Bilzerian, 29 F.3d 689, 697 (D.C. Cir. 1994). We stated in SEC v. Calvo, 378 F.3d 1211, 1217 (11th Cir. 2004), that if a precise calculation of illegally obtained profits is not feasible, a reasonable approximation will do. Id. at 1217 ("The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains. . . . Exactitude is not a requirement."). To the extent Prochnow argues that disgorgement was inappropriate because of his good faith efforts to comply with the consent decree, his argument is unpersuasive. As we explained in FTC v. Gem Merchandising Corp., 87 F.3d 466, 468–70 (11th Cir. 1996), disgorgement is not a punishment, it is a mechanism to rid the offender of ill-gotten gains.

Again, we will not repeat the details of the calculations the district court used. We think it significant that in finding Prochnow should disgorge a total of $1,685,000 in profits, the court did not consider the $25 million he received when he sold the company in 2000. Our review convinces us that there was no clear error in the court's calculations; they resulted in a reasonable approximation of Prochnow's ill-gotten gains.

Turning now to Prochnow's more general arguments on the disgorgement issue, we reject on the basis of FTC v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1314–15 (8th Cir. 1991), his statute of limitations argument. We also reject Prochnow's argument that instead of ordering disgorgement the district court should have required him to reimburse each customer for the specific injuries suffered. See Gem Merch. Corp., 87 F.3d at 470 ("[B]ecause it is not always possible to distribute the money to the victims of defendant's wrongdoing, a court may order the funds paid to the United States Treasury."). That argument is not supported by the decision he cites for it, see id. at 468–70, and as the district court pointed out, given the state of the business records that his organizations kept, there was no way to calculate the precise amount of injury on a customer-by-customer basis.

D.

Finally, we review <u>de novo</u> whether the total of civil fines and disgorgement ordered by the district court violate the Eight Amendment. <u>United States v. Bajakajian</u>, 524 U.S. 321, 336–37, 118 S. Ct. 2028, 2037–38 (1998). To the extent that Prochnow's argument is based on a comparison of the amount of penalty and disgorgement that he was forced to pay with what others were ordered to pay, we reject it for two reasons. One is that the comparators were not similarly situated with Prochnow because they settled and he did not. The other reason is that any disparity between him and those comparators is not gross enough to violate the Eighth Amendment, anyway. To the extent that Prochnow contends that ordering disgorgement and imposing a civil penalty for the same misconduct violates the Eighth Amendment because it constitutes double payment, we reject that proposition as unsupported by any authority. If an offender like Prochnow could avoid a civil penalty by pointing to the fact that he was going to be required to disgorge his profits, the deterrent effect of the civil penalty would be eviscerated. Offenders could continue to re-offend safe in the knowledge that the most they would ever lose would be the amount of their improper gains. <u>See also</u> <u>Tull v. United States</u>, 481 U.S. 412, 425, 107 S. Ct. 1831, 1839 (1987).

14

**III.**

**AFFIRMED.**